Filed 2/6/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                                )
                                           )
        Plaintiff and Respondent,          )
                                           )            S080947
        v.                                 )
                                           )
SONNY ENRACA,                              )
                                           )         Riverside County
        Defendant and Appellant.           )      Super. Ct. No. CR60333
_____)

In May 1999, defendant Sonny Enraca was convicted of the first degree murders[1] of Ignacio Hernandez and Dedrick Gobert, with a multiple-murder special-circumstance finding.[2]  Defendant was also convicted of assault with a deadly weapon[3] on Jenny Hyon, with a great bodily injury finding.[4]  Firearm use[5] and criminal street gang[6] findings were made as to all three counts.  Defendant was sentenced to death.[7]

---

[1]      Penal Code section 187.  All further statutory references are to the Penal Code unless otherwise indicated.
[2]      Section 190.2, subdivision (a)(3).
[3]      Section 245, subdivision (a)(2).
[4]      Section 12022.7, subdivision (a).
[5]      Section 12022.5, subdivision (a).
[6]      Section 186.22, subdivision (b)(1).
[7]      The court also sentenced defendant to a determinate term of 12 years:  three years for the assault with a deadly weapon conviction, with a consecutive three-year great bodily injury enhancement, plus consecutive terms of four years and two years for the firearm use and gang enhancements, respectively.  The determinate term was ordered stayed pending execution of the death sentence.

This appeal is automatic. We affirm the judgment.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. Prosecution Evidence

The victims were shot during a gang fight in November 1994. Associates of both defendant and the victims testified for the prosecution. Defendant's companions identified him as the shooter, but the victims' companions were unable to do so. Defendant admitted to both his friends and the police that he shot the victims.

#### a. Testimony of the Victims' Companions

Late one evening Maile Gilleres and Jenny Hyon accompanied Ignacio Hernandez and Dedrick Gobert to the site of illegal street races. During one race Hernandez's car was cut off by an "Asian" [8] driver. Both men got out of their cars and fought. At least 10 other Asians surrounded Hernandez, but when the police arrived, everyone drove away.

Gobert, Hernandez, Hyon, and Gilleres drove to a nearby pizza parlor. When they got out of their cars, the same group of Asians approached them and the two groups cursed at one another. One of the Asians, whom Gilleres described as a Filipino,[9] pointed a gun at Hyon. He put the weapon away when a slightly older Asian man said something to him. Gilleres told the older man that she

---

[8]     This is the term the witnesses used to refer to persons of Asian-Pacific-Islander heritage.

[9]     Gilleres testified that she was of mixed "Hawaiian, Japanese, Mexican, [and] Filipino" heritage herself, and that she could generally distinguish members of various Asian-Pacific-Islander groups based on their physical appearance.

would get her group to leave if he and his friends did the same.  He nodded in agreement and the two groups parted.

Gobert got into his car and drove up and down the street for several minutes.  A different group of 15 to 35 Asians, dressed in red, started chanting, "Blood, blood, blood."  Gilleres assumed they were claiming to be members of the Bloods gang.  Gobert parked and approached the group.  Making hand signs indicating he was a member of the Crips gang, Gobert said to them, "What's up, cuz?"

A gang expert testified that it would be an insult for a member of a Crips gang to address members of a Bloods gang as "cuz" because the term is used to refer to Crips.  He further testified they would have lost credibility in the gang culture if they had failed to avenge such an insult.  Therefore, an attack on Gobert carried out under these circumstances would be undertaken for the benefit of defendant's Akraho Boyz Crazzys (ABC) gang.

The Asians immediately charged Gobert, threw him to the ground, and beat him.  As Hernandez and Gilleres tried to shield him, gunshots rang out.  Gilleres saw an Asian man shooting down at Hernandez.  Hyon was struck by a bullet.  As a result of a neck wound, she was paralyzed from the chest down.

Gilleres did not identify defendant in a pretrial photo lineup.  She testified at trial that he was not the person she saw shoot Hernandez.  Instead, the shooter appeared to be the person who had pointed a gun at Hyon in the preceding incident.  Hyon was unable to identify her assailant.  She testified it was possible the shooter was the person who had earlier pointed a gun at her.

*b.  Testimony of Defendant's Companions*

Among the prosecution witnesses were four of defendant's friends:  Lester Maliwat, Roger Boring, Eric Garcia, and John Frick.  Along with defendant, they

3

were members of the ABC gang, an affiliate of the Bloods. Before driving to the street races that night, they had met at Boring's home, where defendant was living. According to Boring, defendant was "drinking pretty heavily" and "doing speed."[10] Garcia testified that defendant used speed frequently and offered him some that night. According to Maliwat, defendant had a revolver with him.

After the races, the ABC gang members congregated in the parking lot of the pizza parlor. Gobert drove up, approached them, and made hand signs indicating he was a member of the Crips gang. He said, "Fuck you, slobs."[11] According to one witness, he shouted, "I'm not afraid to die." The ABC's, including defendant, just laughed at Gobert because he appeared to be intoxicated and was outnumbered 10 or 20 to one. Then Gobert stuck his hand into his waistband. Thinking he was reaching for a gun, Boring, Maliwat, and the other ABC's rushed him, knocked him down, and kicked him. According to Detective Schultz, Lester Maliwat told him defendant was involved in the fight. A passerby also told Schultz that "the shooter" was involved in the fight and had "gotten off the ground right prior to the shooting."

Boring testified that he saw defendant shoot Gobert. When Hernandez tried to shield Gobert with his body, defendant pulled him up and shot him, also. When Jenny Hyon kicked defendant in the back, he turned around and shot her.[12]

Maliwat testified that he ran away when he heard someone yell, "He has a gun." From his car Maliwat saw defendant shoot a man lying on the ground. He

---

[10] Defense expert Dr. James Rosenberg later clarified that "doing speed" is a slang phrase for taking methamphetamine.
[11] Maliwat testified that "slobs" was an insulting term Crips used for Bloods.
[12] On cross-examination, Boring admitted he falsely told a defense investigator that he had not seen who fired the shots. He also admitted that he told the prosecutor's office what he thought it wanted to hear.

could not see whether the victim was Gobert or Hernandez. Maliwat also saw a girl lying on the ground. As Maliwat began to drive away, defendant jumped in the car. Maliwat asked him why he shot the girl. Defendant said, "Fuck them. They deserved it."[13]

Eric Garcia saw the fight and heard the shots. Another participant told Garcia that defendant was the shooter. Garcia confronted defendant, demanding to know why he did it. Defendant initially refused to answer, but finally replied, "Maybe they deserved it." Defendant gave Garcia a revolver but reclaimed it a few days later. Defendant then gave the gun to another ABC member, Mike Betts. Defendant later called Garcia from jail and said he had confessed. He said that he would be a man about it and did not want the other ABC's involved.

### c. Defendant's Confession

Following his arrest defendant waived his *Miranda* rights.[14] The interrogation ended when defendant subsequently asked for a lawyer. However, during the booking process, defendant waived his rights again and confessed to the booking officer, Detective Spidle. Defendant now contends his second waiver was not knowing and intelligent. The facts relevant to this claim will be set forth below. (*Post*, pt. II.A.)

Defendant told Spidle the following. After the races, Gobert[15] drove up and skidded to a halt in front of the ABC's. After apparently taking something out

---

[13] Maliwat had pleaded guilty to being an accessory after the fact. He had served his sentence and completed probation when he testified. He admitted lying repeatedly to law enforcement officers about this matter.

[14] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[15] Defendant did not refer to the victims by name. He called Gobert, for example, "the black guy." However, the references are clear because he said they were the "people that I shot."

5

of his car, Gobert walked up to them. He was "claiming some crip gang" and "talking all sorts of shit." Because they vastly outnumbered Gobert, the ABC's "just started giggling." Gilleres told Gobert, "[K]ick back, that's not them." However, Gobert challenged the gang and lifted up his shirt as if he had a gun. After an ABC gang member shouted, "[H]e's reaching, he's reaching," someone punched Gobert, and they fell to the ground. When the other ABC's rushed Gobert, his companions Ignacio Hernandez, Jenny Hyon, and Maile Gilleres came to his defense. Defendant told Spidle that he tried to "break it up."

Hernandez shielded Gobert's body with his own. Defendant grabbed Hernandez by the hair, pulled his head back, and asked him where he was from. When Hernandez hit his hand, defendant shot him with a .38-caliber revolver. Hernandez moved and defendant shot him again. Defendant claimed that before Hernandez hit him he had planned to shoot in the air to break up the fight. Defendant also claimed he was afraid Hernandez was about to shoot him with the gun that, defendant believed, Gobert was carrying. He admitted, however, that he never saw a gun.

After Gobert cursed at him, defendant also shot Gobert. Defendant claimed he was also afraid Gobert was about to grab a gun, although again he had not seen one.

Jenny Hyon pushed defendant, saying, "[F]uck you asshole, what are you doing." She was about to hit him. Defendant pointed his gun at her and started walking backwards. When Hyon charged him, defendant shot her. He intended to fire in the air, "like right by her or . . . over her head."

Defendant jumped into Lester Maliwat's car. As Maliwat drove back to his house, defendant threw the gun out the window.

6

### d. Forensic Evidence

When sheriff's deputies arrived at the scene Hernandez and Gobert were dead. Autopsies revealed they were shot from behind and died from their wounds. Hernandez was shot twice. One bullet entered his back and passed through his heart and lungs. The other entered the back of his head, went through his brain, and lodged underneath the skin of his forehead. Abrasions on Hernandez's forehead suggested he was shot facedown on a hard surface that blocked the bullet's exit. Gobert was shot once, in the back of the head. According to eyewitness Alfred Ward, defendant shot Jenny Hyon "from behind" as well. The bullets recovered from Hernandez and Gobert were .38 caliber.

### 2. Defense Evidence

The defense called several eyewitnesses. Daryl Arquero, John Frick, and Cedrick Lopez were or had been members of the ABC gang. According to Arquero, Gobert claimed to be a Crip and said, "Fuck you, slobs." Frick and Lopez heard Gobert say he was not afraid to die. According to Arquero, Gobert lifted his shirt and displayed a shiny object stuck in his pants. Frick and Lopez saw Gobert make a reaching movement, either lifting up his shirt or reaching inside his waistband. Arquero exclaimed, "Oh, shit. I think he's got a gun." The ABC's rushed Gobert. Arquero estimated that Gobert was shot two minutes later.[16] All three testified they did not see who the shooter was.

The defense argued that eyewitness descriptions of the shooter's clothing did not match what defendant wore that night. Prosecution witness Lester Maliwat testified that defendant wore dark pants and a light blue shirt. Defense witnesses Marcus Freeman and Alfred Ward testified that the shooter wore a white

---

[16] Herman Flores estimated the time lapse at "a minute or so."

hooded sweatshirt. However, Freeman said that the shooter put the sweatshirt on immediately before the shootings. Detective Larry Dejarnett, a prosecution rebuttal witness, testified that Ward told him the shooter wore a black hood and later said he was not sure what color the hood was.[17]

Defendant told Detective Spidle that at the time of the shootings he was "coming down" from two "lines" of "speed" he had taken earlier in the evening. It made him "kind of scared, nervous." Asked how much alcohol he had consumed, defendant told Spidle, "maybe six,"[18] but that he was only "buzzed" because "it takes a lot for me to get drunk."

According to Eric Garcia, defendant showed him some speed that night and asked Garcia whether he wanted to use it with him. Garcia declined. He believed that defendant took some speed, but he was not certain.

Roger Boring testified that defendant "was drinking" that night, but that he did not know whether defendant had "a lot" to drink.

Dr. James Rosenberg, a psychiatrist who also specialized in psychopharmacology, testified for the defense. He had not tested or interviewed defendant. According to Dr. Rosenberg, methamphetamine use can cause very severe disturbances in thinking similar to those associated with paranoid psychosis or manic-depressive illness. "[P]robably the most characteristic would be . . . an

---

[17]    Defendant does not challenge the sufficiency of the evidence to support his conviction. Nevertheless, he calls attention to defense testimony suggesting that there was a second shooter at the scene. Twenty-two-caliber bullet casings were found nearby. However, the bullets recovered from the victims were .38 caliber. Defendant told the police he was carrying a .38 revolver that evening, and he confessed to the police and his friends that he used it to kill the victims. His friends testified that they saw him shoot the victims. That someone may have fired a .22 in the area, at some undetermined time, did not bolster defendant's case.

[18]    Defendant did not specify the type of alcohol or the size of the six units.

8

irrational fear that someone is trying to hurt you." A minor threat may be perceived as a very severe and life-threatening situation. Methamphetamine use is believed to produce these symptoms by releasing "adrenalin-type chemicals." The half-life of methamphetamine is typically 11 hours. However, the effects of methamphetamine intoxication may last much longer, depending on the individual. In Rosenberg's opinion, a hypothetical description based on the facts of this case was consistent with methamphetamine intoxication. While the interactive effect of methamphetamine and alcohol was not well developed in the medical literature, alcohol intoxication would be another factor affecting judgment and impulse control.

## B. Penalty Phase

### 1. Prosecution Evidence

Jenny Hyon testified the bullet that struck her completely severed her spinal cord. As a consequence, she had difficulty breathing, could not tend to her bodily functions, and was confined to a wheelchair. She had no feeling below her chest, except for nearly constant pain in one arm that made sleeping difficult. She worried about who would care for her when her mother and younger sister could no longer do so. "What kills me the most" were the sacrifices her mother had made for her.

Carmen Vera was Ignacio Hernandez's mother. Hernandez was 19 when he was murdered. He was a good boy, and a good student. He was not a gang member, nor did he use drugs. After he died, Vera received notice that he had been accepted to college in a mechanical engineering program. Hernandez's murder deeply grieved Vera and her younger son, Emanuel. Ms. Vera went to a psychiatrist for three years. For two and a half years, unable to bring herself to tell

9

Emanuel of his brother's death, Vera told Emanuel that Hernandez was in New York with her family.

Carolyn Gobert was Dedrick Gobert's mother. He was 19 or 20 when he was murdered. An aspiring actor, Dedrick was in three movies, television shows, and a commercial. Ms. Gobert's whole life was changed by the murder. She was under psychiatric care, her attendance at work suffered, and she withdrew from her friends. Her younger son's performance in school also suffered greatly.

### 2. Defense Evidence

The defense called witnesses who knew defendant during different periods of his life: (1) Defendant's extended family from the Philippines who cared for him until he was eight; (2) relatives who met defendant when he was 14 and moved to California with his mother and stepfather; and (3) the surrogate families defendant joined when he left home.[19] Defendant's half sister Lilibeth, who first met him when he was eight, also testified.

Defendant's mother Shirley grew up in the Philippines. When Shirley was 16 she gave birth to Lilibeth, but abandoned her to the care of her sister Pina. A year later, Shirley returned, pregnant with defendant. She consigned him to Pina's care also. Two years later, Shirley returned for Lilibeth, but not defendant.

In addition to defendant, Pina's family included her husband Raymond, their four children, and Raymond's parents "Mamang" and "Tatai." All of them traveled from the Philippines to testify on defendant's behalf. The extended family provided a caring and affectionate home. Although they were not related to

---

**19** Because many of the witnesses shared last names we will refer to them by their first names or the informal names used by family members.

him by blood, Mamang and Tatai treated defendant as if he were their eldest grandson.

When defendant was eight, Shirley returned and took him to Guam, where her husband Robert Harris was in the United States military. Defendant was heartbroken at leaving the only family he had ever known.

According to Lilibeth, Shirley and Robert did not treat defendant like their other children. Shirley said that defendant was the product of rape.[20] Shirley humiliated defendant by telling others of his bedwetting. She also held him up to ridicule for his tendency to twitch and have convulsions.

Robert was physically and emotionally abusive to Shirley and the children. Lilibeth feared Robert might kill her. He broke several of Shirley's bones, and struck defendant with a belt. The police were often summoned. Shirley and the children once sought refuge in a domestic violence shelter. The children were aware that Shirley and Robert had extramarital affairs.

When defendant was in the seventh grade the family moved from Japan to California. In addition to Lilibeth, Robert's mother, sister, and brother described defendant's family life at that time. Robert remained physically abusive. Defendant cried often, missed his grandmother, and wanted to return to the Philippines. Shirley again abandoned her children, leaving for New York. Lilibeth visited Shirley there, but defendant was not welcome.

While still in his middle teens, defendant left home, finding shelter with the families of ABC gang members. Their mothers became surrogate parents to him. Two of them testified. They loved defendant as a son and he responded in kind, calling them "Mom" or "Mother." He was respectful and helpful. He cooked, did

---

[20] Pina testified that Shirley's rape story was untrue.

yard work, and cared for the younger children. Defendant assisted at a residential care facility for Alzheimer's patients managed by one of the women.

Dr. Jean F. Nidorf testified as a cultural mental health expert. She based her opinions on interviews with defendant, members of his family, and his friends; police reports; investigative materials prepared by the public defender's office; a videotape and transcript of defendant's confession to Detective Spidle; and other materials.

In Nidorf's opinion, the ABC gang was a surrogate family, replacing the one defendant lost when he was taken from the Philippines. He lived with the families of gang members, ingratiating himself with their mothers. While defendant reported to Nidorf he felt welcomed, he moved frequently to avoid burdening their hospitality.

Within the gang defendant aspired to a role as peacemaker, moral conscience, and wise leader. He needed to feel important. He told Nidorf the gang members "needed me." She concluded he was grandiose about his role.

Defendant related that he had been using speed almost every day. In Nidorf's experience, many Asian and Southeast Asian young people are drawn to speed to overcome anxiety about feeling small and weak.

Nidorf thought defendant appeared to express remorse in his videotaped statement to Detective Spidle. "[H]e felt badly about what he had done. He didn't want people to do that anymore. He didn't want people to gangbang. He wanted them to go to church, and I saw that as remorse." Based on her interviews with defendant, she concluded he "sincerely felt that what he did was wrong and that he regretted it."

## II. DISCUSSION

### A. The Admissibility of Defendant's Confession

As we explain in greater detail below, defendant was advised of his *Miranda* rights, waived them, and agreed to talk to Detectives Schultz and Horton. He denied responsibility for these crimes, then requested counsel. Interrogation stopped. Defendant later initiated a conversation with the booking officer, Detective Spidle, and confessed to him.

Defendant contends his confession should have been suppressed on the following grounds: (A) Schultz continued to interrogate him after he requested counsel. (B) Schultz should have told him that he could consult with appointed counsel immediately, rather than telling him that counsel would be appointed when he was arraigned. (C) Schultz and Spidle failed to advise him of his rights under the Vienna Convention on Consular Relations (Apr. 24, 1963, 21 U.S.T. 77) and the bilateral consular convention between the United States and the Philippines. Defendant's claims lack merit.

The evidence considered at the suppression hearing consisted of the testimony of Schultz and Spidle and the transcripts of their interviews with defendant.

#### 1. Background

Defendant was arrested several weeks after the shootings. He had been in custody for two hours when questioning began. The officers knew that defendant was born in the Philippines, lived in the United States, and had a "green card." Schultz gave defendant the standard *Miranda* admonitions.[21] Defendant said that

---

[21] "[Schultz :] I read to him, 'You have the right to remain silent. Anything you say can and will be used against you in a court of law. [¶] You have the right to talk to a lawyer and have him present with you while you're being questioned. If

*(footnote continued on next page)*

13

he understood his rights and wished to speak to them.  Defendant said he read and understood English well.  He initialed the boxes on the waiver form indicating that he understood his rights and that, with those rights in mind, wished to speak to the officers.  Defendant also signed the form.  Schultz did not notify the Philippine consulate of defendant's arrest, nor did he advise defendant of his right to such notification.

The interview lasted 15 to 20 minutes and ended in a confrontation. Schultz told defendant that several eyewitnesses had identified him as the shooter, and that his "only chance in life" was to tell the officers his side of the story. Defendant persisted in proclaiming his innocence and challenged Schultz to produce the witnesses.

"[Schultz]:  I've already talked to them[,] wise guy.

"[Defendant]:  Shit.

"[Schultz]:  And I'[ve] about had it up to here with you cuz you're full of shit and that's it.

"[Defendant]:  Okay, can I get an attorney then, huh?

"[Schultz]:  You can get anything you want[,] turn around, you're going to jail for double homicides.

"[Defendant]:  Yeah, yeah, yeah.

"[Schultz]:  I don't need your yeah, yeah, do you understand me[,] from now on you are to shut your mouth[,] I don't want to hear another word out of you[,] do you understand that?

_____

*(footnote continued from previous page)*

you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one."

14

"[Defendant]: Yes sir.

"[Schultz]: Thank you.

"[Defendant]: Can I ask a question?

"[Schultz]: Only if it's polite.

"[Defendant]: When am I going to see my lawyer[?]

"[Schultz]: I don't know[.] I don't pay for your lawyer, you do.

"[Defendant]: I thought I was going to get appointed one.

"[Schultz]: You can, when you go to court and get arraigned, one will be appointed to represent you. [T]hat's when you can see your lawyer. Now I suggest[] for the next 48 hours, that you deeply consider that[.] Is that all clear[?]"

Schultz broke off the interview and turned defendant over to Spidle for booking. Spidle had worked on the case, but had not been part of the interrogation. Schultz told Spidle that defendant had "invoked," which Spidle understood to mean that he had asked for counsel. In addition to photographing and fingerprinting defendant, Spidle permitted him to call his girlfriend.

Throughout the booking interview defendant interrupted Spidle to ask questions or make comments. Defendant asked when he would get a lawyer. Spidle explained that if defendant was eligible, counsel would be appointed for him when he was arraigned, which would occur in 48 to 72 hours. Defendant asked whether a reward had been offered. Spidle replied he was not aware of one. Defendant said, "You know, it's not how it went down." Spidle admonished him, "Once you ask for a lawyer, we're not going to question you any further about how it went down." Defendant asked, "What if I say what happened?" Spidle repeated that he was not allowed to question defendant because he had invoked his right to counsel. However, if defendant wished to make a statement, he would record it and provide it to the prosecutor's office. Defendant said that was what he wanted to do.

15

Spidle got a tape recorder, turned it on, and said, "[O]kay, what time is it?" Defendant immediately interrupted him to say, "Okay, what I'm going to tell you is that it didn't involve anybody else and I did this." Spidle in turn interrupted defendant to establish for the record that he had been booking defendant, that he had not asked defendant any questions about the shootings, and that defendant had volunteered that he wished to talk about what had happened. Defendant confirmed these statements were accurate. He stated that he had been advised of his rights and did not need to have them repeated.

"[Spidle]: Okay, and so knowing what your rights are, you want to tell me what happened. [G]o right ahead, lay it out.

"[Defendant]: I want to tell this because I just want to make it clear [that no one else was involved]. I mean I did it and that's the whole thing, my friends are my friends still no matter what.

"[Spidle]: Okay.

"[Defendant]: . . . I just got to face it, I'm caught[,] you know."

The transcript of defendant's confession, which we summarized in the statement of facts (pt. I.A.1.c.), is 35 pages long. At its conclusion the following colloquy occurred.

"[Spidle]: . . . I just want to go over this with [you] again. You're telling me this because you wanted to tell me this?

"[Defendant]: Yes.

"[Spidle]: Okay, not because I forced you, or asked you any questions?

"[Defendant]: No, no, no.

"[Spidle]: Okay.

"[Defendant]: I figure you guys already know [so] I might as well let you know the real story."

16

Spidle asked, "Why did you pick me?" Defendant said that he had chosen to confess to Spidle because the other detectives were "assholes." Spidle had treated him with respect, so he respected Spidle.

Spidle pursued the point. "[S]omewhere down the road someone is going to want to make a big deal that I made you talk or something.

"[Defendant]: No, no.

"[Spidle]: Okay.

"[Defendant]: Even if a lawyer would say that[,] you know[,] you made him talk, I would tell the lawyer that he is wrong."

### 2. *General Principles*

The principles of law applicable to defendant's *Miranda* claim are well established.

Questioning remains an important part of any criminal investigation. Police officers may legitimately endeavor to secure a suspect's participation in the interrogation process so long as constitutional safeguards are honored. (See *Miranda*, *supra*, 384 U.S. at p. 478.)

Once an in-custody suspect invokes his right to either silence or counsel, interrogation must cease. (*Miranda*, *supra*, 384 U.S. at pp. 473-474.) If the right to counsel is invoked, the suspect cannot be interrogated further, unless counsel is provided (*ibid*.) or the suspect reinitiates contact with the police. (*Minnick v. Mississippi* (1990) 498 U.S. 146, 156; *Solem v. Stumes* (1984) 465 U.S. 638, 646; *Edwards v. Arizona* (1981) 451 U.S. 477, 485-486; *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1122.) Interrogation includes both express questioning and "words or actions . . . the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fns. omitted.)

17

"After a suspect has invoked the right to counsel, police officers may nonetheless resume their interrogation if 'the suspect "(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." ' (*Connecticut v. Barrett* (1987) 479 U.S. 523, 527; see also *Smith v. Illinois* (1984) 469 U.S. 91, 95; *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1044 . . . .)  The waiver must be ' "knowing and intelligent . . . under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." ' (*Bradshaw*, *supra*, at p. 1046, quoting *Edwards* [*v. Arizona* (1981)] 451 U.S. [477,] 486, fn. 9.)" (*People v. Davis* (2009) 46 Cal.4th 539, 596; accord, *People v. Gamache* (2010) 48 Cal.4th 347, 385 (*Gamache*).)  The prosecution has the burden of proof on these points. (*Gamache*, at pp. 384-385.)

" 'In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.)" (*People v. Thomas* (2011) 51 Cal.4th 449, 476.)

In denying the motion to suppress, the trial court made the following findings.  Defendant was properly advised of his *Miranda* rights, signed a form waiving them, and demonstrated his understanding by later invoking his right to counsel.  At that point the interrogation ended.  While Spidle was engaged in a legitimate booking process defendant initiated the conversation leading to his confession.  Spidle admonished defendant that Spidle could not question him because defendant had invoked his right to counsel.  Nevertheless, defendant wanted to confess and waived his rights.  The court concluded that, under the

totality of the circumstances, "this is clearly a waiver freely and voluntarily and intelligently made."

(A)

Substantial evidence supports the trial court's findings, including the finding that when Schultz concluded that defendant had invoked his right to counsel, Schultz stopped interrogating defendant. Instead, he told defendant, "from now on you are to shut your mouth[,] I don't want to hear another word out of you[,] do you understand that?" Saying he understood, defendant asked Schultz when he would see his attorney and whether one would be appointed for him. Schultz responded, "You can, when you go to court and get arraigned, one will be appointed to represent you. [T]hat's when you can see your lawyer. Now I suggest[] for the next 48 hours, that you deeply consider that[.] Is that all clear[?]" Schultz then turned defendant over to Spidle for booking, informing Spidle that defendant had invoked his right to counsel.

In arguing that Schultz continued to interrogate him after he invoked his right to counsel, defendant relies on a single sentence uttered by Schultz: "Now I suggest[] for the next 48 hours, that you deeply consider that[.]" Defendant makes the argument that Schultz admitted on recross-examination that this statement was "calculated to get [defendant] to 'speak with law enforcement without a lawyer being present.' "

Defendant blatantly misstates the record. Schultz did not testify his statement was intended to convince defendant to speak to one of the detectives in the absence of counsel. Schultz testified that he was encouraging defendant to use the next 48 hours to reflect on his crimes and to reconsider his attitude.[22]

---

[22] In the exchange in question, defense counsel asked Schultz, "The 48 hours you made reference to in your last statement when you told Mr. Enraca [to] 'deeply

*(footnote continued on next page)*

Moreover, Schultz's intent is not determinative. "In deciding whether police conduct was 'reasonably likely' to elicit an incriminating response from the suspect, we consider primarily the perceptions of the suspect rather than the intent of the police. (*Arizona v. Mauro* [(1987) 481 U.S. 520,] 527; *Rhode Island v. Innis*, *supra*, [446 U.S.] at p. 301.)" (*People v. Davis*, *supra*, 36 Cal.4th at p. 554.) To determine defendant's likely perception, the statement at issue must be considered in context. Defendant is highly unlikely to have understood Schultz's statement as encouragement to continue or renew the interview. In virtually the same breath Schultz told him in no uncertain terms: "[F]rom now on you are to shut your mouth[,] I don't want to hear another word out of you[,] do you

---

*(footnote continued from previous page)*

consider that,' that's the period of time when Mr. Enraca would be able to speak to you or law enforcement without a lawyer being present. Is that fair to say?" Schultz responded, "If that was his choice, yes, sir."

On redirect, Schultz clarified his intent. He drew an analogy to "talking to your kids when they do something wrong. 'I suggest you think about it.' " He said he was encouraging defendant to use the 48 hours before arraignment to consider his crimes and his "wise guy" attitude. "[Prosecutor:] Did that comment have anything to do with his attitude? [¶] [Schultz:] I would say so, yes. [¶] [Prosecutor:] And what was that? [¶] [Schultz:] Only that he'd become quite disenchanted, quite upset. And I suggested that he think about his actions. And, you know, I used the term 'the next 48 hours' because, you know, that's the time before arraignment, approximately 48 hours. [¶] [Prosecutor:] Did your term 'wise guy' have anything to do with . . . what you considered to be his attitude? [¶] [Schultz:] Yes. [¶] [Prosecutor:] Was that what you were talking about when you suggested he think about it? [¶] [Defense counsel:] Objection. Leading. [¶] [The court:] Overruled. [¶] [Schultz:] Yes."

On recross-examination, defense counsel asked Schultz, "You didn't tell [defendant] that he needs to contact you within this 48-hour period if he wants to speak to you without benefit of a lawyer?" Schultz responded, "No." Defense counsel then asked, "Did you tell Detective Spidle that you had perhaps suggested to the defendant he should possibly talk to you in the next 48 hours?" Schultz responded, "No."

20

understand that?" Defendant responded, "Yes sir." Moreover, when defendant did seek to initiate a conversation with Spidle about what happened, Spidle admonished him: "Once you ask for a lawyer, we're not going to question you any further about how it went down." Defendant persisted and asked, "What if I say what happened?" Spidle repeated that questioning was not permitted because of defendant's invocation. Only after defendant confirmed that he wanted to make a statement was the recording made.

Finally, defendant told Spidle why he initiated the conversation. It was not because of Schultz's remark. He manifestly held Schultz in low regard. Defendant spoke to Spidle because "I figure you guys already know [so] I might as well let you know the real story." He chose to confess to Spidle, rather than Schultz, because Spidle had treated him with respect. He insisted, "Even if a lawyer would say that . . . you made him talk, I would tell the lawyer that he is wrong."

In *People v. Sapp* (2003) 31 Cal.4th 240 (*Sapp*), the officer made a similar parting remark after the defendant invoked his right to counsel. The officer "gave defendant his card and told him to 'think about it overnight,' adding that before the homicide investigators could again talk to defendant with or without an attorney being present, defendant would have to 'get in contact' with them." (*Id.* at p. 264.) We held that Sapp's confession was voluntary. "[W]hen defendant unequivocally told Detective Tye he wanted an attorney, Tye stopped his questioning and properly advised defendant that none of the homicide investigators could question him unless defendant initiated contact with them. [Citation.] Some 24 hours later, defendant summoned a jail guard and asked for the homicide investigators to come back so he could admit to three murders. [Citation.] Thereafter, he gave investigators a detailed account of the murders and led them to the crime scenes. Defendant was over 30, obviously intelligent and

21

well-acquainted with the criminal justice system. The totality of circumstances show his decision to summon the investigators was not the result of coercion. On these facts, voluntariness is established beyond a reasonable doubt." (*Id.* at p. 268.)

In seeking to distinguish *Sapp*, defendant again distorts the record here. Defendant asserts that Detective Schultz "physically threatened" him. To the contrary, when defendant was placed in the interview room, Schulz removed his handcuffs, thus removing a source of discomfort and limitation on movement. Schultz warned defendant that he would be physically restrained if he tried to escape. The admonition was colorful, [23] but not improper. Defendant asserts that Schultz "verbally abused and cursed at" him. Schultz did say, "I'[ve] about had it up to here with you cuz you're full of shit and that's it." However, Schultz was simply responding to defendant in his own mode of expression. Immediately before Schultz's remark, Schultz told defendant that five eyewitnesses had identified defendant as the shooter. Defendant had responded, "Shit." Defendant complains that Schultz called him a liar. Schultz did do so. However, defendant was indeed lying to Schultz, as he admitted to Spidle. Further, officers may legitimately accuse a suspect of lying. (*In re Joe R.* (1980) 27 Cal.3d 496, 515.) The totality of the circumstances support the trial court's findings that Schultz properly ended the interrogation and that defendant initiated the conversation with Spidle, waived his *Miranda* rights, and made his statements freely, voluntarily, and intelligently.

---

[23] "[Schultz:] I'm going to take those handcuffs off you. I guarantee you if you try and leave this room . . . . [¶] [Defendant:] I'm not going to try and leave this room. [¶] [Schultz:] You're gonna think WWF's Santa Claus, okay? [¶] [Defendant:] Okay."

(B)

There is no merit to defendant's claim that Schultz should have told him that he could consult with appointed counsel immediately. Defendant was correctly informed that he could acquire his own counsel or, if he was eligible, counsel would be appointed when he was arraigned. "That is in fact when his right to counsel attached. (*United States v. Gouveia* (1984) 467 U.S. 180, 185, 187; see *Duckworth v. Eagan* (1989) 492 U.S. 195, 203-204." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1045; accord, *People v. Smith* (2007) 40 Cal.4th 483, 503.) "*Miranda* does not require that attorneys be producible on call, or that police 'keep a suspect abreast of his various options for legal representation.' (*People v. Bradford*, *supra*, 14 Cal.4th at p. 1046.)" (*Smith*, *supra*, 40 Cal.4th at p. 503.)

(C)

Finally, we turn to defendant's claims under the Vienna Convention on Consular Relations and the bilateral consular convention between the United States and the Philippines. Article 36, paragraph 1(b), of the Vienna Convention, which the United States has ratified, provides that law enforcement officials " 'shall . . . inform' arrested foreign nationals of their right to have their consulate notified of their arrest, and if a national so requests, inform the consular post that the national is under arrest." (*People v. Mendoza* (2007) 42 Cal.4th 686, 709.) Article VII, paragraph 2 of the United States consular convention with the Philippines provides that whenever their nationals are arrested, consular officers are to be notified immediately and permitted to visit them without delay.

*Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331 (*Sanchez-Llamas*) was decided after defendant gave his confession. There, the United States Supreme Court made it clear that an officer's failure to notify a suspect of his or her

23

consular rights does not, in itself, render a confession inadmissible. "The violation of the right to consular notification . . . is at best remotely connected to the gathering of evidence. Article 36 has nothing whatsoever to do with searches or interrogations. Indeed, Article 36 does not guarantee defendants *any* assistance at all. The provision secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention — not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention. In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police.

"Moreover, the reasons we often require suppression for Fourth and Fifth Amendment violations are entirely absent from the consular notification context. We require exclusion of coerced confessions both because we disapprove of such coercion and because such confessions tend to be unreliable. *Watkins v. Sowders*, 449 U.S. 341, 347 (1981). We exclude the fruits of unreasonable searches on the theory that without a strong deterrent, the constraints of the Fourth Amendment might be too easily disregarded by law enforcement. *Elkins v. United States*, 364 U.S. 206, 217 (1960). The situation here is quite different. The failure to inform a defendant of his Article 36 rights is unlikely, with any frequency, to produce unreliable confessions. And unlike the search-and-seizure context — where the need to obtain valuable evidence may tempt authorities to transgress Fourth Amendment limitations — police win little, if any, practical advantage from violating Article 36. Suppression would be a vastly disproportionate remedy for an Article 36 violation." (*Sanchez-Llamas*, *supra*, 548 U.S. at p. 349.)

The *Sanchez-Llamas* court added that a violation of the right of consular notification is not without remedy in appropriate cases. "[S]uppression is not the only means of vindicating Vienna Convention rights. A defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his

24

statements to police." (*Sanchez-Llamas*, *supra*, 548 U.S. at p. 350.) Defendant did so here. The trial court found a "clear violation" of article 36.[24] However, it further found that no causal relationship or linkage had been shown between the violation and defendant's confession.

Defendant claims that this finding was a conclusion of law, not a finding of fact. He asserts the finding only anticipated *Sanchez-Llamas*'s legal holding that a consular violation does not, in itself, render a confession inadmissible. The passage referenced by defendant does anticipate that holding. The trial court observed: "You've equated it to *Miranda*, almost. In *Miranda* . . . [t]here's linkage, something that flows from that directly, and I don't see that there is any case authority or any logical proposition that a violation of the Vienna Convention means that you can't introduce a statement." However, defendant fails to mention the preceding and succeeding paragraphs. There the trial court explicitly made a factual finding that, under the totality of the circumstances, defendant's confession was not linked to the consular convention violation. "[I]t hasn't been shown to me that this violation [has] a linkage with any statements given." "How has this harmed this individual in getting a fair trial? . . . I don't think it links up . . . . I am looking to see if he is harmed in the totality. He was afforded, so far as I can see, all his constitutional rights." The record clearly supports this finding.

As the *Sanchez-Llamas* court noted, article 36 "secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention — not to have . . . law enforcement authorities cease their investigation pending any such notice or intervention." (*Sanchez-Llamas*, *supra*, 548 U.S. at p. 349.) Defendant made his confession while he was being booked, within a few hours of

---

[24] We are not called upon to consider the correctness of that ruling.

his arrest and several weeks after the murders. Even if we assume, as the trial court did, that the Philippine consulate would have provided a lawyer for defendant and that the consular officers and counsel would have advised defendant to remain silent, there was no showing that this would have occurred before defendant was booked.

For the same reasons, defendant's claim under the United States bilateral consular convention with the Philippines also fails.

## B. Refusal to Instruct on Heat of Passion

Defendant contends the trial court erred by refusing his request to instruct the jury on voluntary manslaughter due to heat of passion. The claim fails because the requested instructions were not supported by substantial evidence.

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.)" (*People v. Martinez* (2010) 47 Cal.4th 911, 953; accord, *People v. Booker* (2011) 51 Cal.4th 141, 179 (*Booker*).)

" 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.' (*People v. Blair* [(2005)] 36 Cal.4th [686,] 745, citing *People v. Breverman*, *supra*, 19 Cal.4th at p. 162.)" (*People v. Burney* (2009) 47 Cal.4th 203, 250.)

"Murder is the unlawful killing of a human being with malice aforethought. (See § 187, subd. (a).) A murder, however, may be reduced to voluntary manslaughter if the victim engaged in provocative conduct that would cause an

26

ordinary person with an average disposition to act rashly or without due deliberation and reflection." (*Booker*, *supra*, 51 Cal.4th at p. 183, fn. 23.)

Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. (E.g., *People v. Moye* (2009) 47 Cal.4th 537, 549-550 (*Moye*).) The standard is not the reaction of a "reasonable gang member." (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1087.)

Subjectively, "the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. ([*People v.*] *Wickersham* [(1982)] 32 Cal.3d [307,] 327.) 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' (*People v. Barton* [(1995)] 12 Cal.4th [186,] 201.)" (*Moye*, *supra*, 47 Cal.4th at p. 550.)

The trial court instructed the jury on perfect and imperfect defense of self or another. However, it declined to instruct on heat of passion because it found no evidence that defendant acted under the influence of such passion. The court observed: "I don't see any . . . heat of passion here at all or sudden quarrel." Defendant's "passions weren't aroused. It was either self-defense or he killed somebody." "They were laughing at this guy until they had a belief they were going to get shot at."

We agree there was no substantial evidence that defendant acted under the heat of passion. Indeed, all the evidence is to the contrary. Defendant claims that he shot the victims in the heat of passion provoked by Gobert's "belligerent behavior" and conduct insulting to the ABC gang. However, we have rejected

27

arguments that insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter. (*People v. Avila* (2009) 46 Cal.4th 680, 706-707; see also *People v. Manriquez* (2005) 37 Cal.4th 547, 586.) Moreover, defendant told Detective Spidle that until Gobert appeared to reach for a gun, he and the other ABC's just laughed at him. "[W]e just started giggling." The other ABC's confirmed this. Lester Maliwat testified that the ABC's were not provoked by Gobert's jibes, but rather considered him laughable because he was so badly outnumbered. "Q. Okay. When the black guy said to you, 'Fuck you slobs,' what was your reaction? [¶] A. I just started laughing. [¶] Q. Why did you laugh? [¶] A. Because he was the only guy there." Roger Boring's testimony was consistent with Maliwat's. "Q. Okay. Did other people in your group besides yourself laugh at this guy because you didn't take him seriously? . . . [¶] . . . [¶] A. I noticed a couple that didn't take him seriously at the time."

Defendant acknowledges that the ABC's did not consider Gobert a "serious threat" at first. However, he claims that his assessment changed, prompting him to respond in the heat of passion, when Gobert appeared to reach for a gun. This claim, too, is belied by the record. Defendant told Detective Spidle that he remained calm and tried to exert a calming influence on the other ABC's even after Gobert apparently reached for a gun and was attacked by the others. Defendant claimed that he tried "to break it up." "I go[,] 'just leave him the fuck alone[,] dude.' " Defendant also told Spidle that he drew his pistol with the intention of stopping the fight. "I was about to shoot in the air so that, everyone would just run. You know so that the whole fight would just break up." "I was just trying to break it up, you know I mean if I wanted to shoot them, if I wanted to intentionally kill these[] guys, I would of done it . . . when they first came up here."

28

Defendant claims that Hernandez and Gobert each appeared to be reaching for a gun while they lay on the ground. However, the autopsy evidence strongly suggests that they were killed facedown, execution style, and not while engaged in a defensive effort. Moreover, defendant's version of the events is of no help to him. Under his scenario, Hernandez responded to being pulled up by the hair by an armed assailant, and Gobert acted in resistance to Hernandez being killed. Predictable and reasonable conduct by a victim resisting felonious assault is not sufficient provocation to merit an instruction on voluntary manslaughter. (*People v. Blacksher* (2011) 52 Cal.4th 769, 833; *People v. Jackson* (1980) 28 Cal.3d 264, 306.)

Finally, defendant claims that the trial court erred in refusing his request to read CALJIC No. 8.73, which instructs that provocation insufficient to reduce homicide to manslaughter may nevertheless be considered on the question of whether the defendant killed with deliberation or premeditation. CALJIC No. 8.73 is a pinpoint instruction that must be given, upon request, only if supported by substantial evidence. (*People v. Ward* (2005) 36 Cal.4th 186, 214.) Substantial evidence was lacking here. Again, the forensic evidence strongly suggested that defendant deliberately executed his victims.

## C. Instructions on Perfect and Imperfect Self-defense

Defendant claims there was no factual basis for instructing the jury that the doctrines of perfect and imperfect self-defense cannot be invoked by a defendant whose own wrongful conduct created the circumstances in which the adversary's attack was legally justified. The claim fails.

"The concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined. We have explained that 'the ordinary self-defense doctrine — applicable when a defendant *reasonably* believes that his safety is

29

endangered — may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances.' (*In re Christian S.* [(1994)] 7 Cal.4th [768,] 773, fn. 1.) As applied to this case, this means that if defendant had first assaulted Cruz, then unreasonably believed Cruz was assaulting him, a claim of imperfect self-defense would be unavailable because a claim of perfect self-defense would have been unavailable had the belief been reasonable. To make the observation in *In re Christian S.* more general, not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense." (*People v. Valencia* (2008) 43 Cal.4th 268, 288-289; see *Booker, supra*, 51 Cal.4th at p. 182; *People v. Randle* (2005) 35 Cal.4th 987, 1001.)

In response to requests by both the prosecution and the defense, the trial court instructed the jury on the law as we have just explained it. It gave CALJIC No. 5.55: "The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense." Pursuant to CALJIC No. 5.17, the jury was also instructed that the principle of imperfect self-defense "is not available, and malice aforethought is not negated, if the defendant[,] by his unlawful or wrongful conduct[,] created the circumstances which legally justified his adversary's use of force."

The Attorney General contends that defendant may not complain of these instructions because he requested them. The doctrine of invited error bars a defendant from challenging an instruction when the defendant has made a conscious and deliberate tactical choice to request it. (*People v. Moore* (2011) 51 Cal.4th 386, 410; *People v. Harris* (2008) 43 Cal.4th 1269, 1293; *People v. Catlin*

30

(2001) 26 Cal.4th 81, 150.)  Here, whether or not defendant made such a choice, the instructions were clearly supported by the record.  When Gobert appeared to reach for a gun, the ABC gang attacked him, threw him to the ground, and beat him.   Hernandez tried to shield Gobert with his body.  Holding his gun in one hand, defendant grabbed Hernandez by the hair, pulled his head back, and asked him where he was from.  Hernandez hit his hand, and defendant shot him.  Hernandez moved and defendant shot him again.  Defendant claimed he fired because he was afraid Hernandez was about to shoot him.  This is scant evidence for this claim, but, even if it were true, defendant had attacked Hernandez as he tried to shield Gobert.  Defendant could claim neither perfect nor imperfect self-defense in the shooting of Gobert.  Once defendant shot Hernandez, Gobert would have reasonably believed he would be shot next.

### D.  Defendant's Waiver of His Right to Testify

Defendant contends the trial court prejudicially erred because it did not advise him of his right to testify or obtain an on-the-record waiver of that right. The claim fails.

A trial court has no duty to give such advice or seek an explicit waiver, unless a conflict with counsel comes to its attention.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1332-1333; *People v. Alcala* (1992) 4 Cal.4th 742, 805-806 (*Alcala*); *In re Horton* (1991) 54 Cal.3d 82, 95.)

Defendant does not assert that a conflict occurred here.  Instead, he asks us to create a new rule of procedure.  He argues that requiring an advisement and explicit waiver, even in the absence of a conflict, "would not only protect [a] defendant's fundamental constitutional right to testify, but also ease the burden on the judicial system" by obviating the need for posttrial evidentiary hearings on the question of waiver.  To the contrary, we reaffirm our previous decisions, in which

"we have rejected similar proposals.  (See *People v. Hendricks* (1987) 43 Cal.3d 584, 592-594; *People v. Murphy* (1972) 8 Cal.3d 349, 366-367; see also *People v. Cox* (1991) 53 Cal.3d 618, 671 [' "[A] trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy; otherwise, the judge would have to conduct a law seminar prior to every criminal trial." ' (Quoting *People v. Mosqueda* (1970) 5 Cal.App.3d 540, 545)].)   When the record fails to disclose a timely and adequate demand to testify, 'a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity.'  (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231-1232; *People v. Guillen* (1974) 37 Cal.App.3d 976, 984-985.)"  (*Alcala*, *supra*, 4 Cal.4th at pp. 805-806.)

### E.  Victim Impact Evidence

Defendant contends that because the trial court failed to give a limiting instruction, sua sponte, regarding the use of victim impact evidence, he was denied his right to a fair and reliable penalty determination under the Eighth and Fourteenth Amendments to the federal Constitution.  This is the instruction he now proposes:  "1. That evidence about the victims' personal characteristics was introduced to give a brief glimpse of [the] victim's life and to inform the jury of the uniqueness of the lives of these victims.  [¶]  2. No human life is worth more than another.  [¶]  3. The bedrock of a penalty determination is an evaluation of the moral culpability of the defendant[.]  [¶]  4. The culpability of the defendant for facts about which he was unaware at the time of the crime is less than for things he knew at the time of the crime."  We reject his argument.

Unless it invites a purely irrational response from the jury, the effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a). The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair. (*People v. Nelson* (2011) 51 Cal.4th 198, 219 (*Nelson*); *People v. Bramit* (2009) 46 Cal.4th 1221, 1240 (*Bramit*); *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056-1057 (*Lewis & Oliver*).)

Pursuant to CALJIC No. 8.85, the penalty jury was instructed to consider, among other factors, the circumstances of defendant's crimes.[25] (See also CALCRIM No. 763.) We have repeatedly held that this instruction adequately informs the jury how to consider victim impact evidence. (*Bramit*, *supra*, 46 Cal.4th at p. 1245; *People v. Zamudio* (2008) 43 Cal.4th 327, 369 (*Zamudio*); *People v. Brown* (2003) 31 Cal.4th 518, 573.) We have also repeatedly held there is no sua sponte duty to give instructions that were substantially similar to the one defendant proposes. (*People v. Carrington* (2009) 47 Cal.4th 145, 198; *Bramit*, at pp. 1244-1245; *Zamudio*, at pp. 369-370.) We have explained that such instructions are misleading insofar as they suggest that the jury may not be moved by sympathy for the victims and their survivors. (*People v. Tate* (2010) 49 Cal.4th 635, 708; *Zamudio*, at p. 369; *People v. Pollock* (2004) 32 Cal.4th 1153, 1195.) Finally, there is no basis in the law for defendant's proposed instruction that "[t]he culpability of the defendant for facts about which he was unaware at the time of the crime is less than for things he knew at the time of the crime." (See *Nelson*, *supra*, 51 Cal.4th at p. 219, fn. 17; *Bramit*, at p. 1240; *Lewis & Oliver*, *supra*, 39 Cal.4th at p. 1057.)

---

[25] The trial court also gave the other instructions that are pertinent to victim impact evidence: CALJIC No. 8.84.1 and CALJIC No. 8.88.

**F. Asserted Improper Prosecutorial Argument**

Defendant contends the prosecutor committed prejudicial misconduct during his penalty phase argument by implying that the victims' families wanted defendant to be sentenced to death. The claim fails.

The views of a victim's family as to the appropriate punishment are beyond the scope of constitutionally permissible victim impact testimony. (*Payne v. Tennessee* (1991) 501 U.S. 808, 830, fn. 2; *People v. Cowan* (2010) 50 Cal.4th 401, 484 (*Cowan*); *People v. Pollock*, *supra*, 32 Cal.4th at p. 1180; see *People v. Smith* (2003) 30 Cal.4th 581, 622.) It follows that a prosecutor may not attribute such views to a victim's family expressly or by implication. Defendant complains that three remarks made by the prosecutor crossed this line.

1. Urging the jury to return a death penalty, the prosecutor said, "If the decision is not the appropriate one in this case, it would bring further injury to the shattered lives of three families." Defense counsel did not object to this remark.

2. Later, speaking of the victims' families, the prosecutor said: "These people look to you for justice. They have waited patiently for 4 1/2 years." Defense counsel objected, "that's improper argument." The court impliedly sustained the objection, giving this admonition: "I want to clarify something, ladies and gentlemen. Public feeling or sentiment should not enter into your determination. It's based solely on those mitigating and aggravating factors in rendering your verdict in the penalty phase." Defense counsel thanked the court, and sought no further intervention.

3. Finally, the prosecutor essentially repeated the first complained-of remark. Acknowledging that the jury had the power to return a verdict of life imprisonment without possibility of parole, the prosecutor argued that to do so would be inappropriate and an "insult" to the victims. "Theirs, not our lives, we would be adding insult to. It's further insult that we'd be adding to theirs and their

34

families'." This time defense counsel did object and the objection was sustained. In response to defense counsel's request for an admonition, the court instructed the jury: "Once again, ladies and gentlemen, public sentiment and public feeling should not come into any decision you make in the penalty phase." The prosecutor said that he had not intended to invoke "public outrage." "My comments are limited specifically to these facts, this defendant, and these victims." Defense counsel objected to the prosecutor's implication. "Again, Your Honor, I'm going to object. What it implies." The following colloquy ensued. "The Court: Victim impact is a consideration for this jury. [¶] [Defense counsel]: But not their desire. [¶] The Court: Victim impact is a consideration for this jury. [¶] [The prosecutor]: Thank you, Your Honor. [¶] [Defense counsel]: That's overruled? [¶] The Court: Yes, ma'am."

Defendant failed to object to the first remark of which he now complains. Therefore, the point is forfeited because any prejudice it may have caused could have been cured by an appropriate admonition. (*People v. Jablonski* (2006) 37 Cal.4th 774, 835; *People v. Arias* (1996) 13 Cal.4th 92, 159.) The court did admonish the jury as to the second remark, and defense counsel sought no additional relief.

Counsel objected in the third instance and sought a curative instruction. The court did inform the jury that *public* sentiment could not affect its verdict. While a correct statement of the law, the instruction did not address the point of which defendant complained, and further instruction would have been appropriate in light of the defense request. The defense position was that the jury was being asked to vote for execution out of concern for the feelings of the victims' families. The defense is correct that such an argument is improper.

The court and prosecution apparently failed to understand the appropriate scope of victim impact testimony. In considering penalty a jury may properly take

35

into account the impact of the *defendant's conduct*.  The concept cannot be stretched to include the potential effect the *jury's decision* may have.

However, any error in this regard was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)  The victims' family members themselves did not express any views on the appropriate punishment, and the prosecutor did not expressly attribute any such views to them.  Defendant had no criminal history and a compelling background of family dysfunction.  However, the evidence reflects that defendant shot and killed Hernandez and Gobert execution-style as they lay facedown on the ground.  He then shot Hyon, paralyzing her for life.  As he fled, he made several statements reflecting his lack of remorse.  This evidence supports a conclusion, beyond a reasonable doubt, that the jury's verdict was based on his conduct rather than the prosecution's complained-of remarks.

### G.  Lack of Remorse

Defendant contends the prosecutor improperly urged the jury to consider defendant's lack of remorse as an aggravating circumstance.  The claim fails.

"Conduct or statements demonstrating a lack of remorse made at the scene of the crime or while fleeing from it may be considered in aggravation as a circumstance of the murder under section 190.3, factor (a).  (*People v. Bonilla* (2007) 41 Cal.4th 313, 356; *People v. Pollock*[, *supra*,] 32 Cal.4th [at p.] 1184 . . . .)  'On the other hand, *postcrime* evidence of remorselessness does not fit within any statutory sentencing factor, and thus should not be urged as aggravating.'  (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1232.)"  (*People v. Collins* (2010) 49 Cal.4th 175, 227.)  When evidence of postcrime remorselessness has been presented, however, the prosecutor may stress that remorse is not available as a mitigating factor.  (*People v. Davis*, *supra*, 46 Cal.4th at p. 620;

36

*People v. Pollock, supra*, 32 Cal.4th at p. 1185; *People v. Mendoza* (2000) 24 Cal.4th 130, 187.)

Here, defendant showed lack of remorse while fleeing the scene. As they drove away Lester Maliwat asked defendant why he had shot Jenny Hyon. Defendant said, "Fuck them. They deserved it." This statement could properly be considered as a circumstance in aggravation under section 190.3, factor (a).

The main thrust of the prosecutor's argument, however, was that the defense attempt to establish remorse as a mitigating factor was belied by the evidence. Defense expert Dr. Jean Nidorf testified that defendant appeared to express remorse in his videotaped statement to Detective Spidle. "[H]e felt badly about what he had done. He didn't want people to do that anymore. He didn't want people to gangbang. He wanted them to go to church, and I saw that as remorse." She further testified that she believed, based on her interviews with defendant, that he "sincerely felt that what he did was wrong and that he regretted it."

The prosecutor began his penalty phase argument by saying that he was forced to anticipate possible defense arguments because, unlike at the guilt phase, he would not have an opportunity for rebuttal. In particular, the prosecutor correctly anticipated that the defense would argue defendant was remorseful. The prosecutor argued that, to the contrary, defendant had shown lack of remorse. The prosecutor introduced the subject of remorse by characterizing it as the "third reason why death is the only appropriate verdict in this case." He reviewed the evidence showing lack of remorse at the scene of the crime or immediately afterward. Later, observing that "[the defense] put remorse in issue, not us," the prosecutor sought to discredit the testimony of Dr. Nidorf, and he called attention to defendant's postcrime statement to Eric Garcia that maybe his victims

37

"deserved it." In recapping the latter evidence, the prosecutor said: "You see, there's no remorse. And lack of remorse is the third thing."

There is a subtle but important distinction between the manifestations of a defendant's remorselessness that may be considered as an aggravating factor and those that may be considered only to rebut remorse as a mitigating factor. The court and the parties should be careful not to blur it. The prosecutor here was not as clear in this regard as he might have been. However, he was not guilty of misconduct for he did not begin discussing any postcrime evidence of remorselessness until after he noted that defendant "put remorse in issue." Moreover, "remorse is universally deemed a factor relevant to penalty. The jury, applying its common sense and life experience, is likely to consider that issue in the exercise of its broad constitutional sentencing discretion no matter what it is told. [Citations.]" (*People v. Keenan* (1988) 46 Cal.3d 478, 510; accord, *People v. Combs* (2004) 34 Cal.4th 821, 866; *People v. Bemore* (2000) 22 Cal.4th 809, 854-855.)

## H. Refusal to Instruct on Lingering Doubt

Defendant contends the trial court's refusal to instruct during the penalty phase on lingering doubt violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We have consistently rejected state and federal law claims that a trial court must specifically instruct on lingering doubt because the concept is sufficiently covered in CALJIC No. 8.85. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1176; *Zamudio*, *supra*, 43 Cal.4th at p. 370; *People v. DePriest* (2007) 42 Cal.4th 1, 59–60.)[26]

---

[26] As noted, CALJIC No. 8.85 was given here. (*Ante*, at p. 33.)

Defendant seeks to distinguish this case on the grounds that (1) an alternate juror was seated during the penalty phase, and (2) the court gave CALJIC No. 17.51.1, which provides in pertinent part that "the alternate juror must accept as having been proved beyond a reasonable doubt, those guilty verdicts and true findings rendered by the jury in the guilt phase of this trial." We recently rejected this argument in *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254 (*Gonzales & Soliz*), in which the defendant claimed that "a lingering doubt instruction is crucial in a penalty *retrial* because a jury that has not decided guilt decides penalty." (*Id.* at p. 325.) We explained: "Had the penalty retrial jury been convinced by defendants' arguments in mitigation based on the circumstances of the capital crimes, it could have used section 190.3, factors (a) and (k), as expressed in CALJIC No. 8.85, to return a verdict of life imprisonment without parole instead of death. It needed no lingering doubt instruction to do so. (*People v. Zamudio*[, *supra*,] 43 Cal.4th 327, 370 . . . [CALJIC No. 8.85 sufficiently covers concept of lingering doubt].)" (*Gonzales & Soliz, supra*, at p. 326.)

Finally, defendant contends that our decision in *People v. Gay* (2008) 42 Cal.4th 1195 (*Gay*) compels a conclusion that a lingering doubt instruction is required when an alternate is seated during the penalty phase. In the context of a penalty retrial, we rejected this argument in *Gonzales & Soliz,* as well. "Unlike the trial court in this case, the court in *Gay* had instructed the penalty retrial jury on lingering doubt, but had limited the evidence the defense could offer and had informed the jury the defendant's responsibility for the shooting had been conclusively proven by the guilt phase verdicts and no evidence to the contrary would be presented. ([*Gay*,] at p. 1224.) We reversed the judgment because '[t]he combination of the evidentiary and instructional errors present[ed] an intolerable risk that the jury did not consider all or a substantial portion of the penalty phase defense, which was lingering doubt.' ([*Gay*,] at p. 1226.) *Gay* is essentially the

39

converse of the present case:  In *Gay*, the trial court instructed the jury on lingering doubt, but precluded the defendant from presenting that defense; in the present case, the trial court allowed defendants to present and argue their lingering doubt defenses, but refused to specifically instruct on lingering doubt.  As we stated in *Gay*, our holding there was not based on any state or federal constitutional right to a lingering doubt instruction; rather, it was based on California's death penalty statute, which authorizes the admission of evidence of innocence at a penalty retrial.  ([*Gay*,] at p. 1220.)  *Gay* is consistent with our prior holdings that a lingering doubt instruction is not required . . . .  We therefore reject defendants' claim that the trial court erred in not instructing on lingering doubt."  (*Gonzales & Soliz, supra,* 52 Cal.4th at p. 326.)

## I.  Challenges to the Death Penalty Law and Instructions

Defendant raises a series of challenges to California's death penalty law and the standard CALJIC sentencing instructions.  We have rejected each of these challenges in the past and do so here.

California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty.  (*People v. Gamache*, *supra*, 48 Cal.4th at p. 406; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1058 (*Barnwell*).)  Specifically, the felony-murder special circumstance (§ 190.2, subd. (a)(17)) is not overbroad and adequately narrows the pool of those eligible for death.  (*Gamache*, *supra*, 48 Cal.4th at p. 406; *People v. Kraft* (2000) 23 Cal.4th 978, 1078.)

Section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty.  (*Tuilaepa*

*v. California* (1994) 512 U.S. 967, 975-976; *People v. D'Arcy* (2010) 48 Cal.4th 257, 308 (*D'Arcy*); *People v. Cruz* (2008) 44 Cal.4th 636, 680 (*Cruz*).)

Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty. (*People v. Burney*, *supra*, 47 Cal.4th at pp. 267-268; *People v. Williams* (2008) 43 Cal.4th 584, 648-649.) This conclusion is not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296. (*D'Arcy*, *supra*, 48 Cal.4th at p. 308; *People v. Carrington*, *supra*, 47 Cal.4th at p. 200; *People v. Mendoza*, *supra*, 42 Cal.4th at p. 707.)

Review for intercase proportionality is not constitutionally compelled. (*Pulley v. Harris* (1984) 465 U.S. 37, 41-42, 50-51; *Bramit*, *supra*, 46 Cal.4th at p. 1250; *People v. Butler* (2009) 46 Cal.4th 847, 885 (*Butler*).)

The use in the sentencing factors of the phrases "*extreme* mental or emotional disturbance" (§ 190.3, factor (d), italics added) and "*extreme* duress or . . . *substantial* domination of another" (*id*., factor (g), italics added) does not inhibit the consideration of mitigating evidence or make the factors impermissibly vague. (*Bramit*, *supra*, 46 Cal.4th at p. 1249; *People v. Bunyard* (2009) 45 Cal.4th 836, 861; *People v. Lewis* (2008) 43 Cal.4th 415, 532.)

The trial court need not label the statutory sentencing factors as either aggravating or mitigating, nor instruct the jury that the absence of mitigating factors does not constitute aggravation. (*D'Arcy*, *supra*, 48 Cal.4th at p. 308;

41

*People v. Watson* (2008) 43 Cal.4th 652, 704; *People v. Cunningham*, *supra*, 25 Cal.4th at p. 1041.)

"Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants." (*People v. Jennings* (2010) 50 Cal.4th 616, 690; see *Cruz*, *supra*, 44 Cal.4th at p. 681; *People v. Johnson* (1992) 3 Cal.4th 1183, 1242-1243.)

The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties. (*People v. Mills* (2010) 48 Cal.4th 158, 215; *Butler*, *supra*, 46 Cal.4th at p. 885; *Barnwell*, *supra*, 41 Cal.4th at p. 1059.)

## III.  DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Enraca

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S080947
**Date Filed:** February 6, 2012

_____

**Court:** Superior
**County:** Riverside
**Judge:** W. Charles Morgan


_____

**Counsel:**

Paul J. Spiegelman, under appointment by the Supreme Court, for Defendant and Appellant.

John T. Philipsborn for the Republic of the Philippines as Amicus Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Paul J. Spiegelman
P.O. Box 22575
San Diego, CA  92192-2575
(858) 452-7121

John T. Philipsborn
507 Polk Street, Suite 350
San Francisco, CA  94102
(415) 771-3801

William M. Wood
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2202