Filed 6/16/14  P. v. Meza CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C068130 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F03721) |
| v. | |
| PEDRO MEZA, | |
| Defendant and Appellant. | |

Appealing from his convictions of voluntary manslaughter and attempted murder, defendant Pedro Meza contends:  (1) the trial court erred by not, as part of instructing on attempted murder, also instructing on the lesser included offense of attempted voluntary manslaughter based on heat of passion; (2) the court erred by not, as part of instructing on murder, also instructing on misdemeanor involuntary manslaughter; and (3) substantial evidence does not support one of the attempted murder convictions.   We disagree with defendant's contentions and affirm the judgment.

FACTS

In an interview with police three days after the killing, defendant described what happened.[1] He was formerly a member of the Brown Pride Sureño gang but was "jumped out" his senior year of high school. On May 5, 2008, he and codefendant Luis Serrato drove to a liquor store and purchased some beer. Defendant was carrying a Smith & Wesson .38 Special revolver in his waistband. As the two left the store, a yellow car pulled up and stopped. Its occupants started yelling at them, calling them "scraps" and "fucking scrap." Defendant saw four people in the yellow car, three males and one female. He recognized the male driver as a Norteño gang member.

Defendant and Serrato got into their own car. Defendant looked at the other car's occupants, and it appeared to him that "they started to reach for something." While telling Serrato to go, defendant pointed his gun towards the yellow car: "I seen a couple of 'em tryin to reach for something. I don't know if they were -- what they were tryin to reach for, so I was like man you sit there and laugh at my knife I can trump that right now and I just shot." "All I heard is scraps and I just got the gun out. I just pointed the gun at 'em and I was like watch out Freddie man [Serrato], dog let's go. Let's go." He said Serrato could not turn the ignition: "[H]e couldn't turn it on, he couldn't turn it off, so that's when I got my gun out." His hand "slipped the trigger" and he fired one shot. "The first shot slipped," he stated. Then, as Serrato's car was backing up, he saw one person get out of the yellow car who was going to throw something at him, so he shot at him. As defendant and Serrato turned onto the street, he saw the driver exit the car, and he shot at him. Defendant claimed he was not aiming when he fired the three shots, but was just trying to scare them off.[2]

---

[1] The interview was videotaped and played for the jury.

[2] Testifying at trial, defendant stated he heard someone in the yellow car yell, "Northside." After getting into Serrato's car, defendant thought he saw the front

2

Defendant's first shot killed Johnny Brinsfield, who had been sitting in the yellow car's front passenger seat. The car's driver was Anthony Amaro. Tanisha Felder and her husband, David Hernandez, sat in the backseat, with Felder sitting behind the driver's seat. Police interviewed Felder on the day after the shooting.[3] She said that on May 5, Amaro, Hernandez, and Brinsfield had been drinking. Felder wanted to play bingo, so she drove them all to the bingo parlor. They were there for only five minutes before security told them to take Brinsfield and leave. Brinsfield was being rowdy and loud. They went to Taco Bell and ate, and then Amaro drove them to the liquor store to buy cigarettes.

Felder stated they pulled in next to another parked car. Two Hispanic males were walking to, and then got into, that car. It was obvious to Felder the two were "Southerners." Brinsfield yelled out, "Northside." Felder looked down for a second, and then looked up. The passenger in the other car pointed a gun at them and started shooting. She thought she was going to be shot in the face. Glass hit Felder in her face. She believed Brinsfield's yelling out "Northside" probably triggered the shooting.[4]

Police interviewed Hernandez after the incident. He denied ever affiliating with a gang, but he acknowledged Amaro had, and he and Amaro were good friends.

---

passenger in the other car reach for something. He saw something chrome and thought it was a gun. He stated he feared for his life, so he shot three times to scare the others off. The first shot went off accidentally; he shot the others to get the two men back into their car. On cross-examination, defendant admitted he had not told police detectives at his interview that he heard someone say "Northside" or that he saw anything chrome. He testified that he made up the statement about one of the passengers reaching for something that was chrome.

[3]    Felder's interview was videotaped and played for the jury.

[4]    At trial, Felder claimed not to recall much. She acknowledged the glass from the broken window cut her face, chest, and leg. When shown a transcript of her interview, she claimed not to recall her statements. She denied saying she heard Brinsfield say, "Northside."

Hernandez recalled seeing a Hispanic male walk out of the liquor store and get into the passenger side of the car parked next to the car he was in.  The male gave Hernandez and his friends a "kinda hard" look.  Hernandez did not remember Brinsfield saying anything to the male.  Hernandez heard shooting and got down.  He got out of his car as the other car backed up quickly and fled the scene.  He threw a cup of soda at the other car. Hernandez said no one in his car had a gun.[5]

Sheriff's detectives arriving at the scene found Brinsfield's body in the front passenger seat of a gold Honda Accord, slumped over towards the driver's side.  The Accord's rear passenger window on the driver's side was shattered.  There was a bullet hole in the store window and a bullet inside the store.

The pathologist later determined Brinsfield died from a gunshot wound to the left side of his back over his shoulder blade.  The bullet passed through his left lung, hitting the airway and pulmonary artery before lodging in the sac around his heart.  There was no exit wound.  Brinsfield was not leaning back against the seat when he was shot; he had to have been pulled forward and slightly rotated to his right to expose his left back to the bullet coming from his left.  No firearms were found in the victims' car.

Searching defendant's bedroom, officers found indications defendant was affiliated with the Sureño gang.  His room was painted blue and white; blue is associated with the Sureños.  A blue bandana was on a shelf.  CD's in the room bore Sureño graffiti. Pictures depicted defendant "throwing" Sureño gang signs.

Sacramento County Sheriff's Detective Jason Ramos was assigned to the gang unit at the time of the shooting, and he testified as an expert on Hispanic street gangs.  He concluded defendant was a Sureño as of the day of the shooting.  He stated defendant's

---

[5]     At trial, Hernandez said he could not recall making most of his prior statements to the police.

shooting of Brinsfield was gang-related. He also said Amaro was a validated Norteño gang member.

Detective Ramos also explained gang culture. Most reasonable people, he said, need an extreme act in order to commit a violent crime or to shoot somebody, but with gang members, the "threshold is much, much lower. All you need is to be looked at the wrong way, so to speak, disrespected or have somebody call you a scrap or a buster, or low or cuz or something like that." "Scrap" is a derogatory term used by Norteños against Sureños. A Sureño called a scrap sees this as a challenge and is expected to respond, especially if he is in the presence of other Sureños. Assaulting the speaker with a weapon is not an entirely uncommon response.

PROCEDURAL HISTORY

A jury acquitted defendant of murdering Brinsfield (count one), but it convicted him on the lesser included offense of voluntary manslaughter. (Pen. Code, § 192, subd. (a).)[6] The jury also convicted him of attempting to murder Amaro, Felder, and Hernandez (counts two through four). (§§ 664, 187, subd. (a).) The jury found true allegations that defendant personally used a firearm (former § 12022.5, subd. (a)(1) (counts one through four); § 1203.06, subd. (a)(1); former § 12022.53, subds. (b), (c), (e)(1) (counts two through four)), and he committed all of the offenses for the benefit of a gang (§ 186.22, subd. (b)(1)). The jury acquitted Serrato of all charges, and he is not a party to this appeal.

The trial court sentenced defendant to a state prison term totaling 68 years four months, calculated as follows: 37 years on count two, attempted murder (the midterm of seven years, plus 20 years for the gun enhancements and 10 years for the gang enhancement); plus a consecutive six years eight months on count one, voluntary

---

[6] Undesignated section references are to the Penal Code.

manslaughter (two years, plus one year four months for the gun enhancement and three years four months for the gang enhancement); plus consecutive terms of 12 years four months each on counts three and four, attempted murder (two years four months, plus six years eight months on the gun enhancements and three years four months on the gang enhancements).

DISCUSSION

I

*Lesser Included Offense Instruction on Attempted Murder Counts*

A trial court must instruct on a lesser included offense if substantial evidence indicates the defendant is guilty only of the lesser offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Defendant requested the trial court, as part of instructing on attempted murder, to instruct on the lesser included offense of attempted voluntary manslaughter based on sudden quarrel or heat of passion. The trial court denied the request, ruling "there was really no substantial evidence to justify giving that instruction given all of the facts and all of the evidence." The court did, however, instruct on the lesser included offense of attempted voluntary manslaughter based on imperfect self-defense.

Defendant contends the trial court violated his due process rights by refusing to instruct the jury on attempted voluntary manslaughter based on sudden quarrel or heat of passion as a lesser included offense of attempted murder. He contends substantial evidence supported giving the instruction, and the failure to give it was prejudicial. We disagree.

" '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the

6

conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " [Citation.]' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 583-584, quoting *People v. Lee* (1999) 20 Cal.4th 47, 59 (*Lee*).)

The test of adequate provocation is an objective one. The provocation "must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment." (*Lee, supra,* 20 Cal.4th at p. 60.) For example, a victim's calling a defendant a "mother fucker" and taunting him that if he had a weapon he should use it did not justify an instruction on voluntary manslaughter, as the provocation was insufficient to cause an average person to become so inflamed as to lose reason and judgment. (*People v. Manriquez, supra*, 37 Cal.4th at pp. 585-586.) Indeed, insults and gang-related challenges are insufficient provocation in an ordinary person to merit an instruction on voluntary manslaughter. (*People v. Enraca* (2012) 53 Cal.4th 735, 759-760.)

There was insufficient evidence to support giving an instruction on heat of passion attempted voluntary manslaughter as a lesser included offense to the attempted murder charges. The provocation here -- being called a scrap, hearing "Northside," seeing an occupant of the car appear to begin to reach for something, seeing another occupant exit the car after the first shot and throw something (a cup of soda) at defendant, and seeing a third occupant exit the car after the second shot -- would not cause an average, sober person to be so inflamed with rage that he would lose reason and judgment. As Detective Ramos testified, gang members react more quickly to less extreme actions than an average, sober person, and this is such a case.

7

The attempted murder victims in particular gave little provocation. They were unarmed, and defendant was driving away from them to safety when he shot at them. Indeed, defendant retained sufficient judgment in the situation to be able to tell Serrato to get them out of there. At best, the evidence shows defendant feared for his safety, not that he was provoked to such an extent he lost all reason and judgment and acted out of inflamed passion. The trial court thus did not err by not instructing on heat of passion attempted voluntary manslaughter as a lesser offense to attempted murder, as substantial evidence did not support such an instruction.

## II

### *Lesser Included Offense on Murder Count*

Defendant contends the trial court erred when it did not instruct *sua sponte* on misdemeanor involuntary manslaughter as a lesser included offense of the murder charge and voluntary manslaughter conviction. He claims his testimony that he accidentally fired the first shot after Serrato had difficulty starting the car was substantial evidence supporting an instruction on involuntary manslaughter based on brandishing a gun. We conclude such an instruction, even if given, would not have changed the verdict.

It is error for a court not to instruct on involuntary manslaughter based on brandishing where substantial evidence shows a person brandished a firearm during a quarrel, and the gun accidentally discharged and killed someone. (*Lee, supra*, 20 Cal.4th at p. 61.) Here, however, any possible error in not instructing the jury on this lesser included offense to murder was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711.)

The jury rejected defendant's claim that he fired the first shot accidentally, and an instruction on misdemeanor involuntary manslaughter would not have changed its decision. The jury was instructed on murder and voluntary manslaughter. To convict defendant of either crime, the jury had to find defendant's intentional act resulted in the victim's death. If the jury believed defendant fired the first shot accidentally, it could

8

only have acquitted him.   The jury did not acquit, and thereby it rejected defendant's claim of accidental shooting.  An instruction allowing the jury to convict on a lesser offense based on the shooting being accidental would not have changed the outcome.

III

*Sufficiency of the Evidence of Attempted Murder of Felder*

Defendant contends his conviction for attempting to murder Felder (count three) is not supported by substantial evidence.  He asserts that because the jury found he lacked malice when he killed Brinsfield, he cannot also be convicted of attempted murder based on the same gunshot towards Felder.  He also claims he cannot be convicted of attempting to murder Felder on a kill zone theory, as there was insufficient evidence he created a kill zone.  We conclude substantial evidence supports his conviction of attempted murder.  We need not address the kill zone argument.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623.)  In this case, the prosecution had to prove defendant acted with the specific intent to kill Felder.

" 'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citation.]' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 741.)  Indeed, where a defendant fires one shot at two people who are in his line of fire, endangering both, a jury may infer the defendant intended to kill both.  (*Id*. at pp. 744-747.)

The evidence was sufficient to establish defendant intended to kill Felder.  He fired his first shot through her window at very close range.  Felder told detectives defendant pointed his gun directly at her group and started shooting.  It was close enough she thought she would be shot in the face.  The first bullet shattered her window, and the broken glass cut her face, chest, and leg.  Additionally, the evidence supports a jury

9

finding that while defendant feared Brinsfield would use deadly force against him, he did not actually fear the same from the others. Because Felder was in defendant's line of fire, and defendant did not feel the need to defend himself against her, the jury could have reasonably concluded on this evidence defendant intended to kill Felder.

Moreover, the fact the jury determined defendant did not have malice when he killed Brinsfield does not prevent us from affirming the attempted murder conviction based on the same evidence. At its core, defendant's argument complains that the verdicts are inconsistent. That is not a ground for reversing the attempted murder conviction. "Consistency in the verdict is not necessary. . . . As was said in *Steckler v. United States* [(2d Cir. 1925)] 7 F.2d 59, 60: 'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.' [Citation.] [¶] That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (*Dunn v. United States* (1932) 284 U.S. 390, 393-394 [76 L.Ed. 356, 358-359].)

Sufficient evidence supports defendant's conviction of attempting to murder Felder.

### DISPOSITION

The judgment is affirmed.

                         NICHOLSON      , Acting P. J.

We concur:

     ROBIE           , J.

     MURRAY       , J.

10