Filed 10/28/14  P. v. Hudson CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GEORGE HUDSON,<br><br>    Defendant and Appellant. | B245904<br><br>(Los Angeles County<br>Super. Ct. No. BA370476) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  John S. Fisher, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found appellant George Hudson guilty of second degree murder (Pen. Code, § 187, subd. (a)).[1]  The jury also found true the allegations that appellant personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)), and that he did so for the benefit of, in the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).  Appellant was sentenced to 40 years to life in state prison, consisting of 15 years to life for murder plus 25 years to life for the firearm allegation, and ordered to pay various fines and fees.

Appellant contends (1) there was no substantial evidence that he was the person who shot the victim, and (2) the trial court erred by not sua sponte instructing the jury on the lesser included offense of voluntary manslaughter and that the prosecution had the burden of proving the absence of heat of passion as an element of murder.  We disagree and affirm.

## FACTS

**Prosecution Case**

### A.  The Murder

On February 7, 2010, at approximately 12:50 p.m., appellant, a member of the All For Crime ("AFC") gang, entered the Compton Market & Liquor store on the corner of 42nd Street and Compton Avenue in Los Angeles.  Appellant was wearing a red hat and was with his cousin, Roderick Harris (Harris).  Ernest Freeman (Freeman) was in the market with his sister, Willicia Moore (Moore).  Either appellant or Harris asked Moore if they could buy some food stamps from her.  She declined.  Appellant bought paper plates, then waited outside the market.

The victim, Ruben Uroza, also known as "Smurf," walked past appellant and Harris outside the market.  Appellant asked the victim where he was from, and the victim responded "38."  The victim started to run down the street.  Appellant and/or Harris yelled something like "fuck 38" and "AFC."  Appellant chased the victim, pulled out a

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

gun, and shot him in the back of the head. The victim fell down in the middle of the street and died from the gunshot wound to the head. Appellant ran away from the scene.

The market had four surveillance cameras. Video from the four cameras was played for the jury; the cameras did not capture the shooting. Appellant had a tattoo on his neck that was consistent with the tattoo evident on the man wearing the red hat in the market's surveillance video.

### B. Witnesses

Freeman, who had been inside the market when appellant was present, told detectives he thought he saw the victim "bang" on appellant outside the market and that he thought they were fighting. Freeman did not see the shooting, but he saw appellant chasing the victim in front of the market and heard gunshots a few seconds later.

Witness A.S., who lived near the market, knew the victim. He also knew that the AFC and 38th Street gangs both claimed that particular territory. A.S. saw the victim walk past appellant, who was wearing a red hat, and another man in front of the market. Appellant asked the victim where he was from, and the victim replied that he was from "38." Appellant ran after the victim. A.S. saw appellant shoot the victim in the middle of the street. A.S. identified appellant in court as the shooter.

Witness Charles L. (Charles), who was in custody at the time of trial, lived across from the market. At trial, Charles denied knowing the victim, witnessing the shooting, or making any statements about the incident. He also stated that it was "bad" to be a snitch while in custody. An audiotape of Charles's interview with detectives was played for the jury. Charles told the detectives that he knew the victim from playing basketball at a nearby park. Charles saw the victim walking towards the park on the day of the shooting. There were some Bloods gang members standing in front of the market. He heard them yell "fuck 38" and "AFC." The victim started to run away. Charles saw the man wearing a red hat run after the victim and shoot him in the middle of the street. The shooter then ran away. During his interview, Charles was shown still photographs from the surveillance videos taken from the market and identified appellant as the shooter.

Miguel Morse (Morse) grew up with appellant.[2]  Morse testified that he did not know if appellant was a member of AFC.  Morse knew that appellant's cousin Harris was a gang member.  In February 2012, Harris pulled a gun on Morse and said, "I ought to kill you," and that Morse better not "snitch."  Morse testified that another AFC gang member also tried to keep him from testifying.  Morse did not know this person's name, but this person was in the courtroom while Morse testified on direct examination and left during cross-examination.  Morse admitted that he told the detectives that appellant was "bragging" about what happened, that appellant and the victim each threw hand signs about their "hood" and "had words," and that appellant started shooting.

**C.  Interview of Appellant**

When detectives interviewed appellant, they told him that the market's surveillance video showed him inside the market just before the shooting.  They asked him if he knew anything about it.  Appellant responded that he did not see anything and did not know anything.  Appellant went to the store to buy paper plates.  When he walked out of the store he saw people running, so he ran too.  Appellant denied shooting the victim.

**D.  Gang Testimony**

The prosecution presented the testimony of two expert witnesses on the AFC gang.  The Compton Market & Liquor store was in territory claimed by both AFC and the 38th Street gang, which are rivals.  AFC is associated with the Bloods gang.  Appellant was a documented, admitted member of AFC with the moniker "CK Brazy," and had numerous gang-related tattoos.  The gang would not allow a person who was not a member to have gang tattoos, because members have to put in work for the gang to earn the tattoos.

---

[2]    Morse did not want to testify at trial.  He ignored a subpoena and was arrested and brought into court to testify.

4

**Defense Case**

Morse's grandfather testified that Morse had a reputation in the family for lying and stealing, and that Morse took medication for a mental illness.

Alonzo Williams (Williams), who lived in the neighborhood near the Compton Market & Liquor store and was a former AFC gang member, saw appellant near the market on the day of the shooting. Williams was listening to an iPod as he walked. He saw a Hispanic man walk across the street toward the market, and then back across the street toward some apartments. Williams saw Henry "Monster" Johnson, an active AFC gang member, in front of the market. Williams pulled out one of his earphones just as Monster chased the Hispanic man and shot him in the street. Williams claimed that appellant was never a member of the AFC gang, just an associate of the gang. Williams did not tell anyone what he saw until the trial because he did not want to be known as a snitch. But as appellant's trial approached, Williams decided to come forward because he did not want an innocent man to go to prison.

Appellant testified that on February 7, 2010, he went to the Compton Market & Liquor store to buy paper plates for his uncle's Super Bowl party. As he walked to the market, he saw his cousin Harris and they continued to the market together. At the market they encountered a man and woman. Appellant went into the market and bought paper plates. He left the market and was standing near the door waiting for Harris when he saw Williams walking toward him. Appellant then saw Monster run across the street and shoot the victim in the head. Appellant was scared and ran away. Appellant denied having a gun or seeing Morse that day. A couple of days later, appellant returned to Texas, where his family lived.

Appellant denied being a gang member, having a moniker, or admitting to police that he was a gang member. He had at least six AFC-related tattoos, and testified that he got most of them in prison as a "fashion statement" and for protection.

5

Appellant did not previously tell the police that Monster was the shooter because he did not want to be labeled as a snitch.

Appellant testified on cross-examination that the victim "never said anything to [him]" and never looked at him.

**Rebuttal**

One of the detectives assigned to the case searched department resources for an AFC gang member named Henry Johnson or a member using the moniker "Monster." The search yielded no results.

## DISCUSSION

### I. Substantial Evidence Supports Appellant's Murder Conviction

Appellant contends that his murder conviction must be reversed because there was no substantial evidence that he was the shooter. We disagree.

In addressing a substantial evidence challenge, we review the entire record in the light most favorable to the judgment to determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Akins* (1997) 56 Cal.App.4th 331, 336.) We presume in support of the judgment the existence of every fact that a trier of fact could reasonably deduce from the evidence. (*Ibid.*) This standard applies whether direct or circumstantial evidence is involved. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) Reversal is not warranted unless it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Appellant makes two arguments in support of his contention. First, he argues that the testimony of the prosecution's four percipient witnesses was so "conflicting, improbable, and highly suspect in content" that it failed to establish appellant was the person who shot the victim. Appellant spends many pages of his opening brief reviewing inconsistencies between the witnesses' statements to the detectives and in court. But as the People point out, this entire argument is an attempt to relitigate the evidence presented to the jury. The jury was well aware of the inconsistencies in the witnesses' statements and the fact that the witnesses were nervous and fearful about testifying. "[I]t

6

is the *jury*, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore, an appellate court may not substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding. [Citations.]" (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) Appellant does not get a second bite at the apple on appeal.

Second, appellant argues that there was no physical evidence to support the finding that he was the shooter. He points out that no gun was ever recovered and that he is not seen in the surveillance video holding a gun. Even so, there was substantial evidence that appellant was the person who shot the victim. The surveillance video placed appellant at the market just before the shooting. Freeman testified that he saw appellant chasing the victim in front of the market and heard gunshots a few seconds later. A.S. saw appellant shoot the victim in the middle of the street, and identified appellant in court as the shooter. Charles told the detectives that he saw appellant run after the victim and shoot him in the middle of the street. Charles also identified appellant as the shooter during his interview with the detectives. And Morse told the detectives that appellant bragged to him about the shooting.

We are satisfied that substantial evidence supports appellant's murder conviction.

## II. The Evidence Did Not Support an Instruction on Voluntary Manslaughter

Appellant next contends that the trial court erred in failing to sua sponte instruct the jury on voluntary manslaughter based on a heat of passion theory as a lesser included offense of murder. He argues that the instruction was warranted because "there was evidence that shortly before the shooting there were words exchanged between the victim and appellant." We find no error.

### A. *Applicable Law*

"Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater

7

cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.) "'The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense.' [Citation.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) This duty exists even in the absence of a request for such instruction or in the face of an objection by the defendant to the giving of the instruction. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) But there is no duty to instruct on a lesser offense, even on request, in the absence of substantial evidence to support the instruction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215; *People v. Rios* (2000) 23 Cal.4th 450, 463, fn. 10.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.]" (*People v. Breverman, supra*, 19 Cal.4th at p. 162.) "'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater was committed.' [Citations.]" (*Ibid*.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Manslaughter is the unlawful killing of a human being without malice. (§ 192.) Voluntary manslaughter is a lesser included offense of murder. (*People v. Breverman, supra*, 19 Cal.4th at p. 154.) Voluntary manslaughter can occur "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).)

"Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citation.] The standard is not the reaction of a 'reasonable gang member.' [Citation.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation. [Citation.] "Heat of passion arises when 'at the time of the killing, the

8

reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" [Citation.]'" (*Ibid.; People v. Moye* (2009) 47 Cal.4th 537, 550.) Both provocation and heat of passion must be affirmatively demonstrated. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.)

### B. Analysis

The trial court had no sua sponte duty to instruct on voluntary manslaughter based on a heat of passion theory because there was no evidence of either provocation on the part of the victim or that appellant killed the victim under the influence of a strong passion.

As to provocation, appellant points to Freeman's statements to detectives that he thought the victim was "banging" on appellant and that they were fighting, and to A.S.'s and Morse's statements that appellant and the victim had a few words. But the only evidence of words spoken by the victim was that he may have claimed membership in the rival 38th Street gang. Such words would not cause an ordinary person to become so inflamed as to lose reason and judgment. (See *People v. Enraca, supra,* 53 Cal.4th 735, 759 ["we have rejected arguments that insults or gang-related challenges would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter"]; *People v. Avila* (2009) 46 Cal.4th 680, 706–707 [even assuming member of victim's group shouted a gang name, utterance not sufficient to provoke ordinary person].) Indeed, the evidence showed that even more inflammatory words were spoken by appellant or his cousin, when responding "fuck 38."

There was also no evidence of the subjective element, i.e., that appellant killed the victim while under the influence of a strong passion induced by the victim's provocation. Appellant's defense at trial was that he was not the shooter. There was no defense that he acted under the heat of passion. Indeed, appellant testified that the victim "never said anything to [him]" and never even looked at him. Thus, appellant's own testimony

9

dispels any theory that he acted under the heat of passion in response to something the victim said.

Accordingly, the trial court did not have a sua sponte duty to instruct on voluntary manslaughter based on heat of passion.

## III. There Was No Duty to Instruct that Heat of Passion Was an Element of Murder the Prosecution Had to Prove

Finally, appellant contends that the trial court erred by not sua sponte instructing the jury that the prosecution bore the burden of establishing beyond a reasonable doubt that the killing was not committed in the heat of passion. There is no merit to this contention.

Our Supreme Court has stated that "in a murder case, unless the People's own evidence suggests that the killing may have been provoked or [was] in honest response to perceived danger, it is the *defendant's* obligation to proffer some showing on these issues sufficient to raise a reasonable doubt of his guilt of murder." (*People v. Rios, supra,* 23 Cal.4th at pp. 461–462.) Thus, only when the issue of provocation or imperfect self-defense is "'properly presented'" in a murder case does the prosecution have the burden of proving beyond a reasonable doubt that these circumstances were lacking in order to establish the murder element of malice. (*Id*. at p. 462.)

Where, as here, there is no evidence of a heat of passion killing caused by sufficient provocation, it necessarily follows that the defendant cannot ask the jury to decide whether he acted under provocation. The law does not require the trial court to instruct on a theory that lacks evidentiary support. (*People v. Rios, supra*, 23 Cal.4th at p. 463, fn. 10.)

10

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
        ASHMANN-GERST


We concur:


_____,J.
        CHAVEZ


_____, J.
        HOFFSTADT

11