Filed 1/21/25  P. v. Santos CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ANTHONY JOSEPH SANTOS IV,<br><br>  Defendant and Appellant. | F086396<br><br>(Super. Ct. No. 22CR-02903)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Anthony Joseph Santos IV shot and killed Andrew May.  Santos was convicted of first degree murder, and the jury found true an enhancement that he personally discharged a firearm, causing death.  Santos was sentenced to 50 years to life,

which included a term of 25 years to life for the firearm enhancement. On appeal, Santos argues that: (1) the trial court erred by failing to instruct the jury on imperfect self-defense; and (2) the trial court abused its discretion because it was not aware that one of the mitigating factors in Penal Code section 1385, subdivision (c) applied. The People disagree. We affirm.

## PROCEDURAL HISTORY

On July 18, 2022, the District Attorney of Merced County filed an information charging Santos with murder (Pen. Code,[1] § 187, subd. (a)). The information also alleged that Santos personally used a firearm (§ 12022.53, subd. (b)), personally discharged a firearm (§ 12022.53, subd. (c)), and personally discharged a firearm, causing death (§ 12022.53, subd. (d)).

On October 11, 2022, a jury found Santos guilty of first degree murder and found that he personally discharged a firearm, causing death. On June 2, 2023, the trial court sentenced Santos to 50 years to life, consisting of an indeterminate term of 25 years to life for first degree murder plus a consecutive term of 25 years to life for the firearm enhancement.[2]

On June 8, 2023, Santos timely filed a notice of appeal.

## FACTUAL SUMMARY

On the morning of May 27, 2022, A.H. was walking with her friend Andrew May from the trailer park where she lived to get breakfast at a nearby restaurant. A.H. heard a

---

[1] Undesignated statutory references are to the Penal Code.

[2] While the trial court sentenced Santos to an indeterminate term, the abstract of judgment was prepared using the form for determinate terms. When a discrepancy exists between a trial court's oral pronouncement and the abstract of judgment, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) We may correct a clerical error in recording a lower court's pronouncement. (*Ibid.*) Accordingly, we will direct the trial court to prepare an amended abstract of judgment using the form for indeterminate terms (CR-292).

gunshot, and looked around to see what was happening.  She saw a white car coming from the direction of the gunshot.  The driver, Santos, pulled up beside A.H. and May.  Santos pointed a "big gun" out his driver side window and shouted at them, asking if they "banged."  May responded by asking Santos, "Who are you?  Where you from?"  Santos did not respond.

May then yelled at Santos, telling him to put the gun down so they could "go toe to toe."  Santos was getting out of the vehicle, but it started rolling, so he got back in.  May yelled at him again, " 'Put the gun down and let's go toe and toe.' "  Santos then put the car in park, got out of the vehicle, and pointed the gun at May.

May began walking toward Santos.  May was unarmed.  Santos yelled at May, "telling him if he takes another step, he's going to shoot."  They were about eight to 10 feet apart.  Santos then fired multiple shots at May, killing him.

R.H. was driving his daughter to school.  On the way, he stopped four or five car lengths behind a white car that was blocking the trailer park's exit.  The victim was in the other lane, so he could not go around.  The driver of the white car got out.  Something about the victim made R.H. want to leave.

R.H. "kind of not looked," then looked again.  He saw a gun pointed down.  Then he "hit reverse" and looked down.  When he looked back up, the person with the gun was shooting at the victim.  After the person with the gun shot the victim, he pointed it at R.H.  R.H. sped away and did not look back.

## DISCUSSION

I.    **The Trial Court Did Not Err by Failing to Instruct the Jury on Imperfect Self-Defense Voluntary Manslaughter**

  A. *Applicable Law and Standard of Review*

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).)  "All murder that is perpetrated by … [a] willful, deliberate, and premeditated killing … is murder of the first degree." (§ 189, subd. (a).)  "Voluntary

3.

'[m]anslaughter, a lesser included offense of murder, is an unlawful killing without malice …. Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense.' " (*People v. Soto* (2018) 4 Cal.5th 968, 974.) "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.)

"[I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter." (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) "Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon* (2016) 1 Cal. 5th 98, 132 (*Simon*).) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*People v. Moye* (2009) 47 Cal.4th 537, 556.)

"We review the trial court's failure to instruct on a lesser included offense de novo [citations,] considering the evidence in the light most favorable to the defendant [citations]." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30; see also *Simon*, *supra*, 1 Cal.5th at p. 133 ["We review de novo a trial court's decision not to give an imperfect self-defense instruction."].)

### B. Analysis

Santos argues that the trial court erred because it did not sua sponte instruct the jury on imperfect self-defense voluntary manslaughter. The People argue, among other

things, that the court was not required to give the instruction because Santos initiated the altercation by pulling up to May and pointing a gun at him while shouting. We agree with the People.

" 'The concepts of perfect and imperfect self-defense are not entirely separate, but are intertwined …. "[T]he ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." ' " (*People v. Enraca* (2012) 53 Cal.4th 735, 761 (*Enraca*).)

For example, in *People v. Booker* (2011) 51 Cal.4th 141, the defendant stabbed victim 1 with a knife. (*Id.* at p. 183.) Victim 2 "responded by retrieving her handgun and threatening to shoot him. [The d]efendant then claimed he struck [victim 2] and took the gun from her. [Victim 3] … charged him, and during the ensuing melee he stabbed both victims and eventually shot [victim 3]." (*Id.* at p. 181.) The defendant argued that the trial court erred by refusing to instruct the jury on imperfect self-defense as to the murders of victims 2 and 3. (*Id.* at 181–182.) Our Supreme Court held that, "[a]s [the] defendant initiated the attack on [victim 1] …, and there was no evidence that [victim 2's] and [victim 3's] subsequent actions were not legally justified, he may not claim imperfect self-defense." (*Id.* at p. 182.)

As another example, in *People v. Seaton* (2001) 26 Cal.4th 598, the defendant argued there was evidence to support an imperfect self-defense instruction, "point[ing] to his testimony that after he struck the victim with his fist, the victim wielded a hammer, which [the] defendant then wrested from the victim and used to attack the victim. He assert[ed] he attacked the victim with the hammer in an effort to protect himself." (*Id.* at p. 664.) Our Supreme Court held that, as the "defendant's testimony showed him to be

5.

the initial aggressor and the victim's response legally justified, [the] defendant could not rely on unreasonable self-defense as a ground for voluntary manslaughter."  (*Ibid.*; see also *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179 ["Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is *legally* justified in resorting to self-defense against the defendant."]; *Enraca*, *supra*, 53 Cal.4th at p. 761 ["if defendant had first assaulted [victim], then unreasonably believed [victim] was assaulting him, a claim of imperfect self-defense would be unavailable[.]"].)

Here, the evidence shows (and no one disputes) that the shooter (Santos) approached May, pointed his gun out his car's window, and shouted at May, asking May if he "banged."  In response, May, who was unarmed, twice told Santos to put the gun down so they could "go toe to toe."  He also walked toward Santos.

Santos does not argue that walking toward him or telling him to put his gun down so he and May could fight was an unlawful response to his actions, nor do we see how it could be given that Santos initiated the confrontation by pulling up to May, pointing his gun out the window, and shouting at May.  While it is not clear that May was trying to deescalate the situation as argued by the People (May continued to walk toward Santos even after Santos warned him not to), there is nothing in the record suggesting that May, who had not yet used any force (let alone deadly force), acted unlawfully.

As there is no evidence in the record suggesting that May was the initial aggressor or that his response to Santos's actions was unlawful, the trial court was not required to instruct the jury on imperfect self-defense.

## II.     Section 1385, Subdivision (c)(2)(C) Does Not Apply Because Application of the Enhancement Did Not Result in a Sentence of Over 20 Years

### A.  Additional Background

At the sentencing hearing, the trial court considered whether to strike the firearm enhancement.  After hearing arguments, the court ruled as follows:

"With respect to the gun enhancement, there was not just – the Court has struggled with this. I do have the discretion to strike that enhancement given the circumstance of this offense. Not one shot, but seven shots pumped into a probably lifeless body shows a tremendous amount of callousness. I think it's wholly appropriate to impose the gun enhancement. It was an integral part of this crime; but for that gun, we wouldn't be here. Therefore, I impose an additional 25 years to life[.]"

### B. Applicable Law

On January 1, 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) (Senate Bill 81) went into effect (Stats. 2021, ch. 721, § 1), amending section 1385 "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

Section 1385, subdivision (c)(1), provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." Section 1385, subdivision (c)(2), provides: "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

As relevant here, section 1385, subdivision (c)(2)(C) provides that, when "application of an enhancement could result in a sentence of over 20 years," "the enhancement shall be dismissed."

### C. Standard of Review

"The proper interpretation of a statute is a question of law we review de novo. [Citations.] ' " ' "As in any case involving statutory interpretation, our fundamental task

7.

here is to determine the Legislature's intent so as to effectuate the law's purpose. [Citation.] We begin by examining the statute's words, giving them a plain and commonsense meaning." ' " ' [Citation.] ' "[W]e look to 'the entire substance of the statute … in order to determine the scope and purpose of the provision …. [Citation.]' [Citation.] That is, we construe the words in question ' "in context, keeping in mind the nature and obvious purpose of the statute[.]' " ' " (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) Where the language supports more than one reasonable construction, we may look to extrinsic aids, including the legislative history, for additional guidance. (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1105–1106.)

### D. Analysis

Santos argues that section 1385, subdivision (c)(2)(C) is applicable here because this subdivision applies even when the sentence is over 20 years before application of the enhancement. According to Santos, "the word *result* is synonymous with *equals*—i.e., one plus one equals, or results in, two." Thus, "the provision would apply in any case in which the result exceeds 20 years, even if the input representing the sentence without the enhancement is already over 20 years." Santos further argues that, as the trial court "was unaware of, or did not fully understand," that this subdivision applied, the matter should be remanded for resentencing.

The People argue that Santos forfeited this argument by failing to raise it below. But even considering the argument on the merits,[3] it fails. We agree with Santos that, based on a plain and common sense meaning, "result" can refer to " 'something obtained by calculation.' " However, we consider words in context, and in context, this definition simply does not fit. If "result" is synonymous with "equals," the subdivision essentially states that it applies when "application of an enhancement could [equal] a sentence of

---

[3] "An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party." (*People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6.)

over 20 years." This is not a reasonable interpretation. Nor is it reasonable to read "result" as referring to a mathematical calculation, because the subdivision does not refer to multiple inputs that, when added together, equal (or "result in") a sentence of over 20 years.

Moreover, a different plain and commonsense meaning of the word "result" does fit. Result also means "to proceed or arise as a consequence, effect, or conclusion." (Merriam-Webster's Dict. Online (2024) <https://www.merriam-webster.com/dictionary/result> [as of Jan. 6, 2025], archived at: <https://perma.cc/K9BH-7E7Z>.) Under this definition, the subdivision only applies when, as a consequence of the enhancement, the sentence is (or could be) over 20 years. (§ 1385, subd. (c)(2)(C). In context and based on the commonsense meaning of "result," this is the definition that was used in the statute. (See also Couzens et al., Sentencing Cal. Crimes (The Rutter Group 2024) § 12:11 ["There will be no entitlement to relief unless it is the application of the term for the enhancement that results in a sentence of longer than 20 years."])[4]

As Santos was sentenced to 25 years to life on count 1, the sentence is not over 20 years as a consequence of the enhancement, and section 1385, subdivision (c)(2)(C) does not apply.

---

[4] As the language does not support more than one reasonable construction, we do not consider the legislative history.

9.

## DISPOSITION

The judgment of the trial court is affirmed.  The court is ordered to prepare an amended abstract of judgment using the form for indeterminate terms (CR-292).  The trial court shall forward to all appropriate parties a certified copy of the amended abstract of judgment.


FAIN, J.*

WE CONCUR:


HILL, P. J.


DE SANTOS, J.

---

* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.