Filed 2/5/25  P. v. Hernandez CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063302 |
| v. | (Super. Ct. No. RIF2103919) |
| JERRY HERNANDEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Jeffrey M. Zimel, Judge. Affirmed and remanded with instructions.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General,

Christopher P. Beesley and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

* * *

Early one morning on his way to work, Jerry Hernandez noticed what appeared to be an abandoned car on the side of the road. After approaching the vehicle, he realized someone was lying on the back seat. Hernandez drove away, but about 10 minutes later he returned, shot the stranger twice in the head, and took his wallet. Minutes later Hernandez boasted about the killing to his brother, who subsequently disclosed Hernandez's involvement to the police.

When interviewed by police, Hernandez gave varying accounts about what happened. At first, he claimed the car was abandoned and he had only stolen a wallet; he later said he shot the car's occupant in self-defense after getting into a verbal and physical alteration. A jury convicted Hernandez of first degree murder.

Hernandez claims the trial court prejudicially erred by refusing to instruct the jury on voluntary manslaughter based on heat of passion, and by failing to sua sponte instruct the jury on provocation, which might reduce first degree murder to second degree murder; he also claims he is owed an additional day of custody credit. We reject his first two contentions and affirm the judgment; however, we agree the abstract of judgment needs correction and therefore remand this matter for further proceedings.

FACTS

Andrew S. sometimes slept in his car if he arrived home late, as he did not want to disturb his family. He suffered from knee problems, so when sleeping in his car, he would lie down in the back seat, leave the rear

2

door open, fully extend his legs, and let his feet hang out. He also sometimes smoked marijuana to alleviate his knee pain.

Early one morning in September 2021, at about 1:30 a.m., Andrew parked his car across the street from a gym in Perris; he then lay down to sleep on the back seat. About 15 minutes later, a man driving home from work became concerned when he noticed feet sticking out of the rear driver's side door, and he stopped to make sure the person inside was alright. Andrew woke up and confirmed he was okay; he was not aggressive in any way.

At 5:30 that morning, Hernandez shot Andrew twice in the head. Hernandez later admitted that he shot Andrew, but he provided conflicting accounts as to why he did so. There was also inconsistent evidence as to where Andrew was and what he was doing (laying down, sitting in the car, or outside the car) when Hernandez shot him.

Business records confirm that Hernandez clocked into his job at a nearby warehouse at 4:54 a.m. but clocked out at 5:00 a.m., claiming his allergies were giving him breathing problems.

About 20 minutes later, Hernandez parked his van near Andrew's car. Surveillance cameras at the gym where Andrew was parked show a person walking between Hernandez's van and the passenger side of Andrew's car, with what appears to be a flashlight, at 5:19 a.m. The van drove away two minutes later.

Hernandez's van returned 10 minutes later at 5:31 a.m. This second visit lasted about 10 minutes and was also caught on the gym's surveillance cameras; what appears to be a flashlight, followed by flashes consistent with gunfire, are visible between Hernandez's van and the passenger side of Andrew's car. Hernandez's van drove away at 5:40 a.m.

3

Hernandez's van returned a third time about 15 minutes later. The surveillance video shows someone exiting the van and walking to the passenger side of Andrew's car. The van drove away two minutes later.

According to Hernandez's brother, B.H., Hernandez returned home from work unexpectedly that morning around 6:00 a.m., parked his van, claimed he left work because there was nothing for him to do, and began pacing back and forth. A few minutes later, Hernandez came into B.H.'s room and said he had killed someone. B.H. did not believe him, so Hernandez showed B.H. a wallet and two expended bullet casings. B.H. knew Hernandez owned a gun; he observed that Hernandez did not appear to be upset. Hernandez told B.H. it felt good to watch someone die.

B.H. was still in disbelief, so the two men drove to the scene, which was near their home, at about 6:40 a.m. They parked and walked to Andrew's car; B.H. saw the body. Hernandez told B.H. that he had been passing by and was trying to help the person, but the person was "sketchy" or "on drugs" and "charged him." Hernandez explained that he shot the person twice outside the vehicle and then put the body back in the car; he later returned and took Andrew's wallet. As Hernandez and B.H. drove home together, Hernandez behaved "[l]ike nothing happened."

Meanwhile, a woman leaving the gym noticed Andrew's car and saw his feet sticking out the open rear door. She called 911 to report the car as a suspicious vehicle.

Responding officers arrived around 7:00 a.m., observed that Andrew's rear driver's side door was open, and found Andrew's body in the vehicle. He was positioned on his right side, covered with a blanket and with his head on a pillow, as if asleep, with a cell phone cradled in his arm.

4

Toxicology testing later indicated the presence of marijuana in his blood, but not alcohol or other drugs.

The entrance wounds indicated the murder weapon was within 18 inches of Andrew's head when it was fired. Additionally, the blood flow from Andrew's wounds, and the absence of blood in certain other parts of the car, were consistent with him having been shot while lying down with his head on the pillow, with his phone nestled in his arm. Andrew was found wearing white socks without shoes, and his socks were clean.

Other than the gunshot wounds, Andrew had no other visible injuries. No firearms or ammunition were found inside the vehicle, and there were no signs of a struggle.

Later that morning, Hernandez's brother, B.H., returned to the scene and reported Hernandez's involvement in the killing. Police apprehended Hernandez shortly thereafter.

When investigators interviewed Hernandez later that day, he gave conflicting versions of what had transpired that morning. At first, he claimed he had scoped out an "abandoned" car to "jack something," found only a wallet containing $7, returned later to make sure he had not missed anything, and then went home to go to sleep.

Later in the interview, Hernandez admitted to shooting the car's occupant. Hernandez claimed that when he first passed by the car, its occupant had been sitting in the back seat; Hernandez asked if he was okay but got no response, so Hernandez went to work. After calling out of his shift, Hernandez returned to the car "out of curiosity"; when the occupant noticed "he was getting jacked," he became "crazy," was not "in his right mind," and said things like, "Get out of here. Fuck you." Hernandez then decided he "had to . . . fight back" and thought to himself, "fuck this fool," "I'm gonna fuck him

5

up," and "I want to fight with him." Hernandez then punched the person, grabbed a gun from the car's passenger seat, and "clipped" the person twice. He then moved the body to the back seat and took the person's wallet, the gun, and a pack of gum. Hernandez added that he had recently "got into a warehouse fight" at work and was "angry," but also claimed he acted in "self-defense." He maintained he did not shoot to kill, but only to make the occupant "shut up already."[1]

Hernandez was charged with first degree murder (Pen. Code,[2] § 187, subd. (a)) and with personally and intentionally discharging a firearm causing the victim's death (§§ 12022.53, subd. (d), 1192.7, subd. (c)(8)). Defense counsel requested jury instructions on both the imperfect self-defense and heat of passion theories of voluntary manslaughter. After reviewing Hernandez's police interview and hearing argument from counsel, the trial court agreed to instruct the jury on imperfect self-defense (CALCRIM No. 571), but declined to instruct on the heat of passion theory of manslaughter (CALCRIM No. 570), finding Hernandez's version of what occurred was "legally insufficient to constitute provocation."

The trial court explained its thinking: "although [Hernandez] does at various times say the word 'self-defense' or 'he was coming at me' or 'it was me or him,' if you follow the story, he makes it pretty clear that he . . . was stealing the victim's wallet when . . . the victim first started saying for him to 'get out of here' and telling him 'fuck you.' That is when the

---

[1] Hernandez's description of what happened was not chronological and was at times rambling and incoherent. Our summary tries to make some sense of his statement.

[2] All further statutory references are to this code.

6

statements are of aggressiveness, when the victim is basically noticing that [Hernandez] is stealing his things, he's 'getting jacked,' as [Hernandez] said. [¶] Again, if I read this correctly, [Hernandez] left and then came back and that is when he clipped the victim or shot and killed the victim. And, yes, he said that 'he kept talking shit' and 'he wouldn't shut up,' but, again, I think those are legally insufficient to constitute provocation."

The jury deliberated for less than two hours and found Hernandez guilty as charged. The trial court sentenced him to 50 years to life in state prison. Hernandez filed a notice of appeal.

DISCUSSION

Hernandez claims that the trial court prejudicially erred by refusing his request to instruct the jury on voluntary manslaughter based on heat of passion, and that it further erred by failing to sua sponte instruct the jury on provocation reducing first degree murder to second degree murder. Before addressing his arguments, we briefly review the legal concepts of provocation and heat of passion.

"'First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation'; '[s]econd degree murder is an unlawful killing with malice, but without . . . premeditation and deliberation'; and voluntary manslaughter is an unlawful intentional killing without malice, premeditation, or deliberation." (*People v. Nunez* (2023) 97 Cal.App.5th 362, 368 (*Nunez*); see *People v. Beltran* (2013) 56 Cal.4th 935, 941-942 (*Beltran*).)

"Provocation may preclude a defendant from subjectively premeditating and deliberating and, as a result, may reduce a murder from first degree to second degree. [Citation.] Likewise, if provocation would cause a reasonable person to react with deadly passion so as to negate the existence

of malice, the crime may be reduced from murder to voluntary manslaughter." (*Nunez, supra,* 97 Cal.App.5th at p. 368.)

Hernandez maintains Andrew provoked him, causing him to act in the heat of passion, and the jury therefore should have been given an opportunity to decide whether that provocation reduced his crime from first degree murder to either second degree murder or voluntary manslaughter.

I.

HEAT OF PASSION INSTRUCTION ON VOLUNTARY MANSLAUGHTER

We first consider whether the trial court erred in refusing to instruct the jury on voluntary manslaughter based on heat of passion. According to Hernandez, his statements to police provided sufficient evidence of provocation to justify an instruction on voluntary manslaughter. He maintains that whether he acted under the heat of passion was a question for the jury to decide. We cannot agree.

As our Supreme Court has explained, "Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, "'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.'" [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*Beltran, supra,* 56 Cal.4th at p. 942, fn. omitted.) The proper focus is not whether the provoking conduct would cause the average person to kill, but rather whether the provocation would cause the average person to have such a passionate response that his reason and judgment are

8

obscured and his reaction overrides his ability to think rationally. (*Id.* at p. 949.)

"Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*).) "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.'" (*Ibid.*) A trial court must instruct the jury on a heat of passion theory of voluntary manslaughter "'only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense.'" (*People v. Nelson* (2016) 1 Cal.5th 513, 538.)

The Supreme Court has "rejected arguments that insults . . . would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter." (*Enraca, supra*, 53 Cal.4th at p. 759; see *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 (*Gutierrez*) ["a voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words"]; see, e.g., *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [evidence that the victim called the defendant a "'mother fucker'" and told him to take out his weapon and use it was "insufficient to cause an average person to become so inflamed as to lose reason and judgment"].)

Applying those standards here, we conclude the trial court properly declined Hernandez's requested instruction because there was insufficient evidence of either objective or subjective provocation to warrant an instruction on heat of passion. Considering Hernandez's varying accounts

9

about what happened, nothing that Andrew allegedly said or did "would cause an ordinary person with an average disposition to act rashly or without due deliberation and reflection." (See *Enraca, supra,* 53 Cal.4th at p. 759.) That goes for Andrew's alleged words to Hernandez (e.g., "Get out of here. Fuck you"). (*Ibid.* [insults do not warrant heat of passion instruction].) Our analysis also applies to any physical response Andrew may have had when Hernandez attempted to steal his wallet. (*Id.* at p. 760 ["[p]redictable and reasonable conduct by a victim resisting felonious assault is not sufficient provocation to merit an instruction on voluntary manslaughter"].) Indeed, even if the two allegedly exchanged blows, that would not rise to the level of provocation necessary to support a voluntary manslaughter instruction. (*Gutierrez, supra,* 45 Cal.4th at p. 827 ["Simple assault, such as [scratching, kicking, and grabbing], also does not rise to the level of provocation necessary to support a voluntary manslaughter instruction"].)

In any event, any error was harmless beyond a reasonable doubt. (See *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn.7 [the *Chapman* harmless error standard[3] applies in reviewing failure to instruct on voluntary manslaughter under a heat of passion theory].) Here, the guilty verdict and the jury's finding that Hernandez committed willful, deliberate, and premeditated first degree murder precluded any possibility of also finding that Hernandez acted under heat of passion because "voluntary manslaughter based on heat of passion is 'manifestly inconsistent' with premeditation and deliberation." (*Schuller, supra,* at p. 265 (conc. opn. of Liu, J.); see *People v. Wang* (2020) 46 Cal.App.5th 1055, 1071-1072 [jury's finding that defendant premeditated and deliberated the killing was "manifestly

---

[3] See *Chapman v. California* (1967) 386 U.S. 18, 24.

inconsistent" with his having acted under the heat of passion, so omission of heat of passion instruction was harmless beyond a reasonable doubt]; *People v. Franklin* (2018) 21 Cal.App.5th 881, 894 ["jury's finding of premeditation and deliberation is 'manifestly inconsistent with having acted under the heat of passion' and nullifies any potential for prejudice"].)

The jury rejected Hernandez's self-defense argument and found him guilty of first degree murder after deliberating for less than two hours. Because any evidence supporting a heat of passion instruction "was, at best, extremely weak," any instructional error was harmless beyond a reasonable doubt. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 621.)

II.

PROVOCATION INSTRUCTION ON SECOND DEGREE MURDER

Hernandez next contends the trial court erred in failing to instruct the jury on provocation that reduces first degree murder to second degree murder. Although no provocation instruction was requested at trial, Hernandez asserts the court had a duty to instruct sua sponte on provocation, and further that his defense counsel was ineffective in declining to request the instruction. Again, we are not persuaded.

As noted above, "[p]rovocation may preclude a defendant from subjectively premeditating and deliberating and, as a result, may reduce a murder from first degree to second degree." (*Nunez, supra,* 97 Cal.App.5th at p. 368; see CALCRIM No. 522.) For provocation to reduce murder from first degree to second degree, "a subjective test applies . . . : it inquires whether the defendant in fact committed the act because he was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime." (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000.)

11

Hernandez claims the trial court should have instructed the jury on provocation even absent a request from counsel to do so. We disagree. Instructions on provocation are pinpoint instructions; the court therefore had no sua sponte duty to give the instruction absent a request. (*People v. Thomas* (2023) 14 Cal.5th 327, 384.) Because Hernandez did not request the instruction, he forfeited the argument.

Hernandez alternatively contends his counsel was ineffective in failing to request the instruction. Again, we are not persuaded. Defense counsel could have reasonably concluded that a CALCRIM No. 522 instruction request would have been denied in light of the trial court's finding, in connection with Hernandez's request for a heat of passion instruction, that Hernandez's version of what occurred was "legally insufficient to constitute provocation."[4]

For the same reasons the evidence was insufficient to support a heat of passion instruction, the evidence was also insufficient to warrant an instruction on subjective provocation under CALCRIM No. 522. As explained above, not one of Hernandez's conflicting accounts of what happened show he subjectively acted because Andrew provoked him. Thus, there is no reasonable probability Hernandez would have obtained a better result had the instruction been given.

---

[4] Voluntary manslaughter based upon heat of passion requires both objective and subjective provocation. (*Enraca, supra*, 53 Cal.4th at p. 759.) Although the trial court did not say whether it found insufficient evidence of objective provocation, subjective provocation, or both, defense counsel could have reasonably determined that the court's finding was not limited to objective provocation only but also encompassed the subjective provocation necessary to support a CALCRIM No. 522 instruction.

The jury instructions and guilty verdict further support our conclusion. The trial court instructed the jury that Hernandez was "guilty of first degree murder if . . . he acted willfully, deliberately, and with premeditation," and that a decision to kill is "not deliberate and premeditated" if "made rashly, impulsively, or without careful consideration." (CALCRIM No. 521.) In finding Hernandez guilty of first degree murder, the jury necessarily concluded he acted with premeditation and deliberation— findings that are inconsistent with Hernandez's assertion that he was provoked.

In short, the trial court did not err in failing to instruct the jury sua sponte with CALCRIM No. 522; defense counsel did not render ineffective assistance in failing to request that instruction; and, in any event, any alleged error was harmless.

## III.

### CUSTODY CREDIT

Hernandez's final contention is that he is entitled to one additional day of custody credit because the trial court's award of 680 days of actual custody credit failed to factor in the day of his sentencing hearing. The Attorney General concedes Hernandez is correct. We agree.

"Calculation of custody credit begins on the day of arrest and continues through the day of sentencing." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.) Police arrested Hernandez on September 9, 2021, and the trial court sentenced him on July 21, 2023. Accordingly, Hernandez is entitled to 681 days of actual custody credit, and the abstract of judgment should be amended to reflect as much.

13

DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court with directions to prepare an amended abstract of judgment consistent with this opinion and to forward a certified copy to the Department of Corrections and Rehabilitation.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.